Marc P. Berger
Sanjay Wadhwa
Wendy B. Tepperman
Nancy A. Brown
Janna Berke
Hane Kim
Victor Suthammanont
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | 19 Civ. ____ ( ) |
| **Plaintiff,** | ECF Case |
| -- against -- | |
| **AR CAPITAL, LLC, NICHOLAS S. SCHORSCH and BRIAN S. BLOCK,** | **COMPLAINT** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants AR Capital, LLC ("AR Capital"), Nicholas S. Schorsch ("Schorsch"), and Brian S. Block ("Block") (together, "Defendants"), alleges:

## PRELIMINARY STATEMENT

1.      Between late 2012 and early January 2014 (the "Relevant Period"), Defendants improperly obtained millions of dollars to which they were not entitled from a publicly-traded

real estate investment trust ("REIT") managed by Defendants, then known as American Realty Capital Properties, Inc. ("ARCP").[1]

2.      AR Capital sponsored and externally managed REITs, including ARCP and two publicly-held, non-traded REITs ("NTRs"), American Realty Capital Trust III, Inc. ("T3") and American Realty Capital Trust IV, Inc. ("T4"), that were merged into ARCP. At all relevant times, Schorsch was AR Capital's chief executive officer ("CEO") and principal owner, and Block was AR Capital's chief financial officer ("CFO") and a minority owner. Schorsch also served as the CEO and chairman of ARCP, T3, and T4, while Block also served as the CFO of each REIT. As a result, Defendants had management control over all three REITs during the Relevant Period.

3.      In connection with separate mergers, first between ARCP and T3, and later between ARCP and T4, AR Capital, acting through Block and Schorsch—without the informed consent of the relevant REIT's board, in contravention of the governing documents and disclosures to shareholders, and in violation of their fiduciary duties—improperly inflated an incentive fee calculation which operated as a fraud or deceit on ARCP and its shareholders. Through their actions, Defendants collected more than 2.9 million operating partnership units ("OP units") of ARCP to which they were not entitled.

4.      Defendants also directed the creation of and/or approved misleading asset purchase and sale agreements in which AR Capital received $5.8 million from ARCP in connection with each merger, purportedly for ARCP's purchase from AR Capital of furniture, fixtures, and equipment ("FF&E") necessary for the T3- or T4-related post-merger operations of

---

[1]     In 2015, ARCP changed its name to VEREIT, Inc.

ARCP and the reimbursement to AR Capital of certain "unreimbursed expenses." Through those agreements, Defendants wrongfully obtained at least $7.27 million in unsupported charges.

5.      In connection with these activities, Defendants made material misstatements and omissions about the incentive fees and FF&E agreements relating to both mergers.

## VIOLATIONS

6.      By engaging in the conduct described in this Complaint, AR Capital and Block violated Sections 17(a)(1), (a)(2), and (a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1), (a)(2), and (a)(3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], as well as Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(2)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1]. Schorsch, by engaging in the conduct described in this Complaint, violated Sections 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (a)(3)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

7.      The Commission brings this action pursuant to the authority conferred on it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d)(1), (d)(3), and (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (d)(3), and (d)(5)] seeking a final judgment: (a) permanently restraining and enjoining AR Capital, Schorsch, and Block from engaging in the acts, practices and courses of business alleged herein; (b) requiring AR Capital, Schorsch, and Block to disgorge ill-gotten gains and to pay prejudgment interest thereon; and (c) imposing civil money penalties on AR Capital, Schorsch, and Block pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa]. Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

9.     Venue is proper in the Southern District of New York pursuant to 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred in the Southern District of New York, including, among other things, certain of Defendants' communications and other actions concerning the incentive fees and FF&E transactions that occurred at AR Capital's principal office in New York, New York.

## THE DEFENDANTS

10.     **AR Capital** is a Delaware limited liability corporation with its principal place of business in New York, New York. Through various wholly-owned subsidiaries, AR Capital sponsored and externally managed T3 and T4 until their respective mergers with ARCP, as well as sponsored and externally managed ARCP, a publicly-traded REIT, until January 8, 2014, when ARCP became self-managed.[2]

11.     **Schorsch**, age 57, resides in Newport, Rhode Island, and Meadowbrook, Pennsylvania. Schorsch directly or indirectly owns and controls a majority interest in AR Capital

_____

[2] AR Capital and its wholly-owned subsidiaries are collectively referred to as "AR Capital" throughout this Complaint.

and, during the Relevant Period, served as CEO and Chairman of T3 and T4 until their mergers

with ARCP, and as CEO and Chairman of ARCP. When ARCP became self-managed in January

2014, Schorsch became directly employed by ARCP and continued to serve as CEO and

Chairman. Schorsch resigned from all roles with ARCP on December 14, 2014.

12.     **Block**, age 46, resides in Hatfield, Pennsylvania. During the Relevant Period,

Block served as CFO of T3 and T4 from their inceptions until their mergers with ARCP, and as

CFO of ARCP. When ARCP became self-managed in January 2014, Block became directly

employed by ARCP and continued to serve as CFO. Block resigned from all roles with ARCP on

October 28, 2014. Block was a CPA licensed in Pennsylvania. His license is currently inactive.

## OTHER RELEVANT ENTITIES

13.     **ARCP** was incorporated in Maryland in 2010 as American Realty Capital

Properties, Inc. and, during the Relevant Period, its principal place of business was in New York,

New York. ARCP conducted an initial public offering of its common stock and began trading on

NASDAQ's Global Select Market in September 2011 as a REIT sponsored and externally

managed by AR Capital, and had no employees of its own. AR Capital continued as ARCP's

external manager until January 8, 2014, when ARCP became self-managed. In 2015, ARCP

changed its name to VEREIT, Inc. and its common stock trades on the NYSE. Notwithstanding

its name change, the entity is referred to as ARCP in this Complaint.

14.     **T3** was incorporated in Maryland and was an NTR sponsored and externally

managed by AR Capital from its inception until the close of its merger with ARCP on February

28, 2013. T3 commenced a public offering of its stock in March 2011 pursuant to an effective

Form S-11 registration statement at a fixed price of $10 per share (less concessions) and closed

the offering in September 2012 after raising over $1.5 billion. T3 entered into a merger

agreement with ARCP on December 14, 2012, which closed on February 28, 2013.

15.     **T4** was incorporated in Maryland and was an NTR sponsored and externally

managed by AR Capital from its inception until the close of its merger with ARCP in January 3,

2014. T4 commenced its public offering in June 2012 pursuant to an effective Form S-11

registration statement at a fixed price of $25 per share (less concessions) and closed the offering

in April 2013 after raising more than $1.75 billion. T4 entered into a merger agreement with

ARCP on July 1, 2013, and which closed (following certain amendments) on January 3, 2014.

## FACTS

**A.      Defendants Obtained Improperly Inflated Promote Fees**

16.     AR Capital's business primarily involved creating and sponsoring NTRs and

publicly-traded REITs, externally managing such REITs, and, for its NTRs, pursuing liquidity

events such as mergers, sales, or public listings. AR Capital was contractually entitled to receive

certain fees from the REITs for each of these activities or events.

17.     ARCP, T3, and T4 were REITs whose common stock was offered to the public

and registered with the Commission. Each REIT was structured as a corporation that conducted

most of its business through an affiliated operating partnership ("OP") entity for which the REIT

served as general partner—ARC Properties Operating Partnership, L.P. (the "ARCP OP"),

American Realty Capital Operating Partnership III, L.P. (the "T3 OP"), and American Realty

Capital Operating Partnership IV, L.P. (the "T4 OP"), respectively. Limited partnership

agreements ("LPAs") governed the T3 OP and T4 OP. Schorsch signed the LPAs as CEO of

each REIT.

18.     The relevant REIT owned units of its affiliated OP entity ("OP units") on a 1:1 basis with the number of shares of common stock outstanding of the REIT, which generally constituted in excess of 95% ownership of the OP entity. The remaining OP units not owned by the REIT were primarily issued to AR Capital and its members and employees as compensation. Subject to certain limitations, including but not limited to minimum holding periods, OP units owned by AR Capital and its members and employees could be converted on a 1:1 basis into shares of common stock of the REIT.

19.     Because T3 and T4 were not publicly traded, generally, the only means through which the NTR could generate liquidity opportunities for its shareholders (other than dividends delivered to investors) would be through a liquidity event, such as a merger, sale, or public listing.

20.     Among other things, the T3 OP and T4 OP LPAs provided that, if T3 or T4 achieved a certain level of return for its common stock shareholders through a liquidity event—such as a merger—AR Capital would be entitled to a "subordinated distribution," colloquially referred to as a "promote fee." The terms "subordinated distribution" and "promote fee" are used interchangeably in this Complaint.

21.     Specifically, the LPAs provided that if the liquidity event provided shareholders with a return in excess of a 6% hurdle rate, AR Capital would be entitled to receive 15% of the amount that was above the hurdle rate. The LPAs further specified that the amount of the return to shareholders was to be determined by T3 and T4 "in good faith" using the "fair market value" of all issued and outstanding shares of the NTR common stock (*i.e.,* the total merger consideration received by the NTR's shareholders) as of the date of the liquidity event (*i.e.,* merger closing date).

22.     In a side letter that was executed in connection with each merger, AR Capital agreed to take the promote fee in OP units of the T3 or T4 OP, which would then be converted into OP units of the ARCP OP in the merger. The LPAs, as confirmed by these side letters, specified the conversion formula to calculate the number of T3 or T4 OP units to be issued for the promote fee. The formula involved simple division using the same fair market value that determined the return to NTR shareholders. The formula did not provide any enhanced value for agreeing to receive NTR OP units instead of cash. As set forth in the side letters and merger agreements, the T3 or T4 OP units would immediately convert to ARCP OP units at the specified merger exchange ratio in accordance with the merger agreements.

23.     AR Capital, Schorsch, and Block each owed a fiduciary duty to T3, T4, and their shareholders. In calculating the promote fees, Defendants (as external managers of T3 and T4) acted on behalf T3 and T4, the entities with the obligation under the LPAs to perform the calculation. Defendants were obligated to act in the best interests of the REITs and their shareholders by either resolving financial conflicts in the shareholders' favor or by obtaining the informed consent of the NTR board.

24.     AR Capital, acting through Block and Schorsch, inflated several aspects of the promote fee calculation and conversion formula in the T3 and T4 mergers that enriched the Defendants at the expense of the REITs and their shareholders. The Defendants' actions were contrary to shareholder disclosures, the LPAs, and the relevant merger side letters, and were not disclosed to the boards or the boards' advisors.

### 1.     **Defendants Inflated the T3 Promote Fee**

25.     T3 and ARCP entered into a merger agreement and related agreements on December 14, 2012. The merger agreement provided that T3 shareholders could elect to receive,

for every share of T3 common stock they held, either (i) 0.95 shares of ARCP common stock or (ii) $12.00 in cash (capped at 30% of the aggregate merger consideration).

26.     Similar to the conversion of the T3 common stock, the merger agreement further provided that T3 OP units, such as those held or to be received by AR Capital for the promote fee, would be automatically converted into 0.95 ARCP OP units.

27.     As the external manager for both T3 and ARCP, AR Capital members, including Schorsch (who also served as Chairman and CEO of ARCP, T3 and T4) and Block (who also served as CFO of ARCP, T3 and T4), were heavily involved in discussions relating to the merger, including by participating in board meetings and providing the outside investment bankers retained by each REIT board with financial models and other information. Schorsch and Block also received memoranda from outside counsel for the REIT boards in connection with the merger that, among other things, set out the governing provisions from the LPA for the promote fee calculation and reminded that, as set forth in guidelines established by the North American Securities Administrators Association, a majority of the independent directors must approve all matters relating to the promote fee.

28.     As authorized by both the T3 and ARCP boards, the related agreements entered into included a side letter with AR Capital (the "T3 side letter") in which T3 (and the T3 OP), ARCP (and the ARCP OP), and AR Capital agreed upon the governing provisions of the T3 OP LPA for the promote fee and that AR Capital would take the promote fee in T3 OP units. The T3 OP units would then be converted into 0.95 ARCP OP units as set forth in the merger agreement. The specified provision in the LPA with the formula for converting the cash value of the promote fee into T3 OP units involved simple division using the same fair market value that determined the return to T3 shareholders. This formula did not provide any enhanced value for AR Capital

agreeing to receive T3 OP units instead of cash. Schorsch signed the T3 side letter on behalf of AR Capital and ARCP.

29.     The merger was announced on December 17, 2012, including in an ARCP Form 8-K filed with the Commission that Schorsch signed. Among other things, the Form 8-K included a description of the merger agreement terms and the T3 side letter, and included both agreements as exhibits.

30.     The merger was contingent on approval by a majority of each of ARCP's and T3's shareholders. To solicit ARCP and T3 shareholders, ARCP and T3 issued a joint proxy statement/prospectus (the "T3 Proxy"), filed with the Commission on January 22, 2013, which set the shareholder voting meeting date for February 26, 2013. Among other things, the T3 Proxy incorporated the T3 side letter and made certain disclosures about the promote fee. In order to register the shares of ARCP common stock to be issued to T3 shareholders in connection with the merger, ARCP also filed a registration statement with the Commission on January 18, 2013, signed by Schorsch, Block, and other directors of the company, which repeated the information and disclosures appearing in the T3 Proxy (the "T3 Merger Registration Statement").

31.     Because of their roles and affiliations with T3 and ARCP, AR Capital, Schorsch, and Block were required to disclose their interests in the merger in the T3 Proxy. The T3 Proxy disclosures designated to describe such interests made representations about how the promote fee (referred to as the subordinated distribution) would be calculated:

> [AR Capital] … will be entitled to subordinated distributions of net sales proceeds from the [T3] OP in an amount estimated to be equal to approximately $59.0 million, assuming an implied price of [T3] common stock of $12.26 per share in the merger (which assumes that 70% of the merger consideration is ARCP common stock based on a per share price of $12.90, the closing price of ARCP common stock the last trading day before public announcement of the merger, and 30% of the merger consideration

is cash). Such subordinated distributions of net sales proceeds is to be finalized based on the closing price of ARCP common stock on the day immediately prior to the closing of the merger, payable in [T3] OP Units that will automatically convert into ARCP OP Units and will be payable upon the consummation of the partnership merger in accordance with the merger agreement.

32.     The T3 Merger Registration Statement included an identical disclosure.

33.     These disclosures set forth an understanding that the promote fee calculation would involve the actual cash/stock elections by T3 shareholders, consistent with the LPA's requirement to calculate the fair market value of all issued and outstanding shares of T3 common stock at the time of the merger closing. The disclosures also set forth that the promote fee would be "finalized based on the closing price of ARCP common stock on the day immediately prior to the closing of the merger"—*i.e.*, the determinative date for setting the implied price of T3 common stock for shares that elected to receive ARCP stock in the merger. According to the T3 Proxy and T3 Merger Registration Statement, AR Capital therefore would be entitled to a promote fee of approximately $59.0 million if, among other things, (a) 30% of T3 shares elected cash; and (b) ARCP's closing price on the day immediately prior to the closing of the merger was $12.90 per share.

34.     Following the February 26, 2013 shareholder meetings, the companies announced that a majority of stockholders of both companies had approved the merger, that the preliminary T3 shareholder voting results showed approximately 15.5% of the outstanding T3 shares elected cash, and that the transaction was expected to close on February 28, 2013. The merger closed, as expected, on February 28, 2013, with final tabulations for T3 shareholder elections of 16.5% of shares electing cash (resulting in 83.5% receiving ARCP shares at the 0.95 exchange ratio).

35.     In contravention of the T3 OP LPA, T3 side letter, and disclosures to shareholders, and without the informed consent of either the T3 or ARCP boards, the Defendants

inflated the calculation of the T3 promote fee in three ways: (i) using a trailing five-day average price of ARCP stock instead of the ARCP closing price on the day prior to the merger closing, (ii) disregarding the actual cash/stock elections by T3's shareholders, and (iii) using an unsupported multiplier in the conversion to OP units portion of the calculation.

### a.   Improper Change to a Trailing 5-Day Average Price Per Share

36.    As specified in the T3 Proxy and T3 Merger Registration Statement, the promote fee payable to AR Capital "is to be finalized based on the *closing price* of ARCP common stock *on the day immediately prior to the closing of the merger*" (emphasis added), and the estimate provided used a single-day ARCP closing price per share. ARCP's closing price was $13.90 on February 27, 2013, the day immediately prior to the closing of the merger.

37.    Block prepared numerous model calculations of the promote fee leading up to and including the merger closing date of February 28, 2013, and provided certain versions to Schorsch. In each of these models, Block used a single-day closing price, consistent with the disclosure.

38.    For example, on February 21, 2013, shortly before the merger vote date, Block sent Schorsch an email, attaching a projected promote fee calculation spreadsheet that used the single day ARCP closing price on February 20, 2013, and stating: "The attachment reflects all updated numbers—just ensuring we have no hiccups when this calculation is run final next week. We were pretty close so I'm feeling good about the computation. I'm feeling even better about the current schedule with a closing price of $14.19...... ($96.5MM)." Schorsch replied to the email, acknowledging its receipt and indicating that he read and understood it: "Agreed it looks [sic][.]"

39.     Schorsch and Block tracked ARCP's closing share price in the days leading up to the merger. Although ARCP's share price reached a high in closing at $14.54 on February 26, 2013, it closed down on heavier than average trading volume at $13.90 on February 27, 2013, the day immediately prior to the merger closing.

40.     On February 28, 2013 at 8:50 p.m., Schorsch sent Block an email with the subject line "Call re promote."

41.     By mid-day on March 1, 2013, AR Capital, acting through Block, decided to inflate the promote fee by using an unweighted average of the closing prices on each of the five days prior to the merger closing ("5-day average") of $14.264—instead of the ARCP closing price on the day immediately prior to the merger closing of $13.90. Also on March 1, Block provided a spreadsheet with the final calculation to Schorsch.

42.     In taking this unauthorized unilateral action that inflated (at the expense of ARCP's shareholders) the promote fee they would receive, AR Capital did not inform or obtain the consent of the T3 or ARCP boards.

**b.     Improper Change from Use of the Actual Merger Consideration**

43.     The final tabulation of the shareholder elections was that 16.5% of T3 common stock shares elected to receive $12 in cash for each T3 share, and the remaining 83.5% of shares received 0.95 shares of ARCP common stock in exchange for each T3 share. Accordingly, Defendants should have calculated the T3 total merger proceeds using the actual consideration paid for the T3 common stock shares—including cash.

44.     As set forth in the formulas disclosed in the T3 Proxy and T3 Merger Registration Statement, and using the actual inputs of the 16.5% cash elections and the ARCP closing share price on the day immediately prior to the merger closing of $13.90, the implied T3 share price

should have been $13.01 per share (*i.e.*, the product of the cash amount ($12.00) multiplied by the percentage of cash elections (16.5%) plus the product of ARCP's share price the day prior to the merger closing ($13.90) multiplied by the exchange ratio (0.95) multiplied by the stock-election percentage (83.5%)).

45.     Defendants disregarded these formulas and disclosures. Instead, Schorsch instructed AR Capital and Block to ignore the actual cash elections and instead calculate the merger proceeds as if 100% of T3 shares had been exchanged for ARCP stock. This ran afoul of both the shareholder disclosures as well as the T3 OP LPA, which required that the promote fee be calculated using the fair market value of *all* issued and outstanding shares of T3 common stock—which included those shares exchanged for $12.00 in cash. In effect, AR Capital's decision was to calculate the purported fair market value by assuming that the approximately 16.5% of T3 shares that received cash instead received shares of ARCP that AR Capital valued at more than $394.4 million (including Defendants' use of the 5-day average price for ARCP stock)—despite the fact that those shareholders received only $350.7 million in cash.

46.     Following the merger closing, and as Schorsch and he discussed, Block performed the calculation as if 100% of the T3 shares were exchanged for ARCP shares, resulting in an inflated implied T3 price per share of $13.55 (inclusive of the inflation caused by AR Capital's unauthorized decision to use a 5-day average price) versus the actual of $13.01, and a promote fee cash value of $98,359,915 versus the actual value of $83,872,012.

47.     Once again, Defendants did not inform or seek approval from the T3 or ARCP boards of their decision to change the calculation of the merger proceeds to assume 100% of the T3 shareholders had elected ARCP stock, a change that benefited Defendants at the expense of shareholders of the post-merger ARCP.

48.     Moreover, on February 28, 2013, the same date as the merger closing, Block and Schorsch each signed ARCP's Form 10-K filed with the Commission for the fiscal year ended December 31, 2012, that reiterated that the merger was expected to close on that date and reiterated the T3 Proxy and T3 Merger Registration Statement disclosure concerning the promote fee, inclusive of the estimate being calculated with the assumption of 70% stock and 30% cash elections. This disclosure was materially misleading in light of the decision of Block and Schorsch to perform the promote calculation without consideration of the actual stock and cash elections.

### c.     Improper Conversion of the Promote Fee into ARCP OP Units

49.     The T3 OP LPA, as confirmed by the T3 side letter, specified the formula for converting the promote fee value into T3 OP units. The conversion formula was simply to divide the cash value of the promote fee by the same fair value of one T3 share used to determine the total merger proceeds. In other words, whatever implied T3 price per share was used to calculate the total merger proceeds (which Defendants here—albeit wrongfully—had calculated as $13.55 per T3 share) in the calculation of the cash value of the promote fee, that same implied T3 price per share should have been used to divide the cash value of promote fee to determine the T3 OP units to issue. Schorsch and Block each received legal memoranda that outside counsel provided to the boards of ARCP and T3 in connection with the merger negotiations, which summarized the promote fee and the conversion to OP units consistent with this method.

50.     As the investment banking firms engaged by the respective boards were modeling the merger and preparing to provide a fairness opinion in early December 2012, AR Capital employees, including Block—as the management for both companies—were specifically asked by the investment bankers engaged by the T3 board in an email: "When calculating the number

of OP units to be issued for the promote, … should we simply divide the total equity value of the promote by the implied offer price per share?" Block, copying Schorsch, responded by highlighting the phrase "simply divide the total equity value of the promote by the implied offer price per share" and confirmed that the highlighted phrase was appropriate.

51.     After the closing of the T3 merger, AR Capital, acting through Block, instead took a third manipulative measure by changing the conversion formula to inflate the number of OP units AR Capital received, and further increase the value of the promote fee owing to AR Capital. Using the division conversion formula set forth in the T3 OP LPA (and T3 side letter) and the multiplication by the merger exchange ratio of 0.95 set forth in the T3 merger agreement (and T3 side letter) would have resulted in 6,895,675 ARCP OP units (*i.e.*, dividing the improperly derived $98,359,915 by the purported $13.55 implied T3 price per share for the conversion to T3 OP units, and then multiplying by the merger exchange ratio of 0.95)—versus the 6,126,199 ARCP OP units to which AR Capital was actually entitled for the promote fee (*i.e.*, dividing the properly calculated promote fee cash value of $83,872,012 by $13.01, the properly calculated implied T3 price per share used to calculate the promote fee cash value, and then multiplying by the merger exchange ratio of 0.95).

52.     However, Block—without any basis—took additional manipulative measures that increased the number ARCP OP units that AR Capital received. Block instead first multiplied his inflated promote fee cash value of $98,359,915 by 1.02618705. Then, rather than using the inflated 5-day average price that he had used to calculate the promote fee cash value, he reverted to the lower closing price per share on the day prior to the merger as the divisor, yielding 7,261,559 ARCP OP units.

53.     These actions not only contravened the T3 OP LPA, T3 side letter, disclosures to boards and investors, and communications with the investment bankers, but also reflect Block's manipulative intent in the simultaneous use of different "fair market values" for the identical T3 shares measured as of the same date. Block's actions on behalf of AR Capital also served to further inflate the number of OP units for AR Capital's benefit at the expense of ARCP and its shareholders. Once again, no one from AR Capital informed the T3 or ARCP boards or shareholders of their actions to calculate the promote fee or conversion in this manner.

54.     Block circulated to Schorsch a spreadsheet of the final promote fee calculation incorporating the manipulative calculations described above.

### d.     Impact of the Defendant's Improper T3 Promote Fee Calculation

55.     Collectively, the three forms of manipulation resulted in AR Capital's receipt of 1,135,360 more ARCP OP units than AR Capital was entitled to receive (*i.e.*, 7,261,559 ARCP OP units received vs. 6,126,199 ARCP OP units to which AR Capital was entitled).

56.     On March 1, 2013, Block circulated to Schorsch a spreadsheet with the final calculation of promote fee that showed each steps of the calculation, including the three manipulations alleged above. The final calculation spreadsheet was never provided to the boards of T3 or ARCP.

57.     Instead, after Block finalized the spreadsheet on March 1, 2013, Defendants participated in creating or approving a "Contribution and Exchange Agreement" for AR Capital to enter into with the T3 OP and the ARCP OP (the "T3 Contribution and Exchange Agreement"). Block signed the agreement on behalf of AR Capital and Schorsch signed the agreement on behalf of the ARCP OP, in his capacity as the CEO of ARCP, the general partner

of the ARCP OP. The agreement was included as an exhibit to a Form 8-K signed by Schorsch that described the agreement and was filed with the Commission on March 6, 2013.

58.     The agreement represented that, under the T3 OP LPA, AR Capital "will be entitled to receive" a promote fee of $98,359,915, and that the conversion to OP units was calculated in accordance with the T3 OP LPA and T3 side letter. AR Capital further represented that nothing in the agreement violated or conflicted with any governing document or agreement by which it was bound—which included the T3 OP LPA and the T3 side letter.

59.     These representations were materially false and misleading. AR Capital was not entitled to receive a promote fee with a cash value of more than $83,872,012; nor was the conversion of the promote fee cash value to OP units calculated in accordance with the T3 OP LPA and T3 side letter, which resulted in further inflation of the value of the promote fee.

60.     Similar misrepresentations were made in subsequent ARCP quarterly and annual reports filed with the Commission on Forms 10-Q and 10-K beginning with the first quarter of 2013 (filed May 6, 2013) through the second quarter of 2014 (filed July 29, 2014), each of which Block and Schorsch signed in their capacities as ARCP's CFO and CEO, respectively. For example, the ARCP Form 10-Q for the first quarter of 2013 stated that upon the consummation of the T3 merger, AR Capital was "entitled to" a promote fee "which resulted in the issuance of [T3] OP units in the [T3] OP, when after applying the Exchange Ratio, resulted in the issuance of an additional 7.3 million [ARCP] OP Units." In fact, AR Capital was only entitled to receive 6,126,199 ARCP OP Units for the promote fee.

61.     Block, who personally performed the calculation of the promote fee and conversion to ARCP OP units in a spreadsheet that he maintained on behalf of AR Capital, knew or recklessly disregarded that each of the three manipulations alleged above contravened the

disclosures to shareholders, the T3 OP LPA, the side letter, legal memoranda prepared by outside counsel to the T3 and ARCP boards concerning the promote fee, presentations to the T3 and ARCP boards, and information provided to T3's and ARCP's investment bankers. Block also knew or recklessly disregarded that his actions improperly inflated the number of ARCP OP units that AR Capital would receive for the promote fee, from which he would also personally benefit. As the CFO of AR Capital, Block's actions and scienter are attributable to AR Capital.

62.     Schorsch was at least negligent when he approved the promote fee and authorized the issuance of the ARCP OP units after receiving Block's spreadsheet with the final calculation of promote fee that showed each step of the calculation, including the three manipulations alleged above. Schorsch had participated in all of the merger-related board meetings for both the T3 and ARCP boards, received the legal memoranda that explained how the promote fee calculation was to be performed, and signed the T3 OP LPA, the T3 side letter, the T3 Merger Registration Statement, the T3 Contribution and Exchange Agreement, and the subsequent Form 10-Qs and Form 10-K. Schorsch knew or should have known that the calculation he approved did not conform to what was authorized by the T3 OP LPA and side letter, the presentation to the boards, and the disclosures to the investors.

**2.     Defendants Inflated the T4 Promote Fee**

63.     Four months after ARCP closed the merger with T3, ARCP and T4 entered into a merger agreement and related agreements on July 1, 2013 (the "T4 merger").

64.     At the time, both ARCP and T4 were externally managed by AR Capital. As the external manager for both T4 and ARCP, AR Capital members, including Schorsch (who also served as Chairman and CEO of each REIT) and Block (who also served as CFO of each REIT), were heavily involved in discussions relating to the merger, including by participating in board

meetings and providing the outside investment bankers retained by each REIT board with financial models and other information. Schorsch and Block also received memoranda from outside counsel for the REIT boards in connection with the merger that, among other things, set out the governing provisions for the promote fee calculation and reminded that a majority of the independent directors must approve all matters relating to the promote fee.

65.     The promote fee provisions in the T4 OP LPA were identical to those in the T3 OP LPA. Schorsch had signed the operative amended and restated T3 OP LPA and T4 OP LPA on November 13, 2013, and November 12, 2013, respectively—approximately one month prior to the T3 merger announcement. Among other things, the T4 OP LPA provision governing the conversion of the promote fee to T4 OP units was identical to that in the T3 OP LPA. The T4 OP LPA conversion formula was simply to divide the cash value of the promote fee by the same fair value of one T4 share used to determine the total merger proceeds. In other words, whatever implied T4 price per share was used to calculate the total merger proceeds in the calculation of the cash value of the promote fee, that same implied T4 price per share was required to be used to divide the cash value of the promote fee to determine the T4 OP units to issue.

66.     Similarly, as authorized by both the T4 and ARCP boards, the merger-related agreements entered into on July 1, 2013, included a side letter with AR Capital (the "T4 side letter") in which T4 (and the T4 OP), ARCP (and the ARCP OP), and AR Capital agreed upon the governing provisions of the T4 OP LPA for the promote fee (including the simple division conversion formula set forth above) and that AR Capital would take the promote fee in T4 OP units, which would then be converted into ARCP OP units at the merger exchange ratio specified in the merger agreement. Schorsch signed the T4 side letter.

67.     The T4 merger was announced on July 2, 2013, including in an ARCP Form 8-K filed with the Commission that Schorsch signed. Among other things, the Form 8-K included a description of the merger agreement terms and the T4 side letter, and included both agreements as exhibits. The Form 8-K also estimated that the promote fee would be approximately $65.2 million, assuming an implied price of T4 common stock of $30.47 per share in the merger, and would be payable in the form of T4 OP units that would automatically convert into ARCP OP units upon the consummation of the T4 merger.

68.     The T4 merger was contingent on approval by a majority of T4's shareholders and an effective ARCP registration statement to issue ARCP shares to T4 shareholders (the "T4 Merger Registration Statement"). To solicit T4 shareholder votes, T4 and ARCP issued a proxy statement/prospectus (the "T4 Proxy") on December 4, 2013.

69.     Because of their roles and affiliations with T4 and ARCP, AR Capital, Schorsch, and Block were required to disclose their interests in the merger in the T4 Proxy. The T4 Proxy disclosures describing such interests made representations about how the promote fee (referred to as the subordinated distribution) would be calculated:

> The amount of such subordinated distribution is estimated to equal approximately $62.7 million, assuming a value of $30.43 for the nominal consideration to [T4] stockholders in the merger (based on the closing price of ARCP common stock of $12.70 per share on October 4, 2013). The amount of such subordinated distributions of net sales proceeds is to be finalized based on the closing price of ARCP common stock on the day immediately prior to the closing of the merger, and will be payable in [T4] OP Units that will automatically convert into ARCP OP Units upon consummation of the mergers in accordance with the [T4] side letter.

70.     All of the relevant representations in the T4 Proxy were repeated in the T4 Merger Registration Statement signed by Schorsch and Block and filed with the Commission.

71.    As set forth in the T4 side letter in reference to the T4 OP LPA, as well as the disclosures to shareholders in the T4 Proxy and T4 Merger Registration Statement, the cash value of the promote fee was to be determined by the implied value per share of T4 common stock derived from the closing price of ARCP common stock on the day immediately prior to the closing of the merger; the conversion into T4 OP units would be calculated by dividing the cash value of the promote fee by that same implied value per share of T4 common stock; and the T4 OP units would be automatically converted into ARCP OP units at the merger exchange ratio set forth in the T4 merger agreement.

72.    Nevertheless, Defendants improperly disregarded the operative agreements and shareholder disclosures, instead using a $22.50 per share insider initial T4 offering price (the "insider T4 initial price") solely for purpose of dividing the cash value of the promote fee to yield the number of T4 OP units, rather than using the fair value of one share of T4 common stock on the date of the merger closing (which they had represented was $30.43 assuming an ARCP closing price of $12.70 per share). The improper use of $22.50 per share as the denominator significantly inflated the number of OP units Defendants received—by approximately one-third. Moreover, once again, Defendants' unauthorized actions were not disclosed to the boards and shareholders.

73.    Schorsch approved AR Capital's use of the $22.50 insider T4 initial price for the conversion despite having signed the T4 side letter that specified the conversion must use the fair value of one share of T4 common stock on the date of the merger closing. Block carried out AR Capital's use of the $22.50 rate as the denominator for the conversion, despite knowledge of all of the agreements and his prior experience with the T3 merger, which included representing to

investment bankers on the T3 merger that the appropriate method was "simply divide the total equity value of the promote by the implied offer price per share."

74.     On January 3, 2014, the date of the closing of the T4 merger, in addition to the improper use of $22.50 as the conversion denominator, Block also took one additional manipulative step to further inflate the promote fee. As of noon on January 3, 2014, Block updated his spreadsheet for the calculation of the promote fee using ARCP's closing price of $12.87 from January 2, 2014, the day immediately prior to the merger closing—the key date set forth in the T4 Proxy and T4 Merger Registration Statement—to calculate an implied T4 price per share of $30.52. But ARCP's share price closed higher at $12.91 on January 3, 2014—the highest price it had achieved in approximately a month. Instead of calculating the promote fee using the closing price the day prior to the merger closing, as disclosures to investors dictated, Block recalculated it using the higher closing price on January 3, 2014, yielding an implied T4 price per share of $30.54 and thereby inflating the cash value of the promote fee by over $1 million.

75.     Block then implemented the use of the $22.50 per share value as the purported fair market value of one share of T4 common stock for the conversion to OP units, wholly disregarding the implied T4 price per share of $30.54 he had just calculated. By doing so, Block substantially inflated the T4 OP units issued in exchange for the cash value of the promote fee, which would then be converted into ARCP OP units at the applicable merger exchange ratio. Block's calculation yielded 6,734,148 ARCP OP units—1,787,085 more ARCP OP units than what AR Capital was entitled to under the T4 OP LPA and T4 side letter.

76.     On or about January 7, 2014, Block shared his promote fee calculation spreadsheet with Schorsch for discussion that showed his use of the incorrect ARCP closing

price date and the conversion that used a $22.50 denominator. Schorsch approved this T4

promote fee calculation. No one from AR Capital provided this final calculation spreadsheet to

either the T4 or ARCP board or shareholders of either company.

77.     Instead, similar to the T3 merger, after their T4 promote fee spreadsheet was

finalized, Defendants participated in creating or approving a "Contribution and Exchange

Agreement" for AR Capital to enter into with the T4 OP and the ARCP OP (the "T4

Contribution and Exchange Agreement"). Block signed the agreement on behalf of AR Capital.

Schorsch signed the agreement on behalf of the T4 OP and the ARCP OP, in his capacity as the

CEO of T4 and ARCP. The agreement was included as an exhibit to a Form 8-K, also signed by

Schorsch, that described the agreement and was filed with the Commission at approximately

5:30 p.m. on January 3, 2014.

78.     This agreement represented that under the T4 OP LPA, AR Capital "will be

entitled to receive" a promote fee of $63,235,388, and that the conversion to 6,734,148 ARCP

OP units was calculated in accordance with the T4 OP LPA and the T4 side letter. AR Capital

further represented that nothing in the agreement violated or conflicted with any governing

document or agreement by which it was bound—which included the T4 OP LPA and the T4 side

letter. These representations were materially false and misleading. AR Capital was not entitled to

receive more than 4,947,063 ARCP OP units for the promote fee.

79.     Similar misrepresentations regarding the promote fee were made in subsequent

ARCP quarterly and annual reports filed with the Commission on Forms 10-K and 10-Q

beginning with the Form 10-K for the fiscal year 2014 (filed February 27, 2014) through the

second quarter of 2014 (filed July 29, 2014), each of which Block and Schorsch signed in their

capacities as CFO and CEO, respectively, of ARCP. The statements regarding the promote fee

omitted material information that the T4 OP LPA, the T4 merger agreement, and the T4 side letter prohibited using a $22.50 insider T4 initial price in converting the promote fee to OP units and that AR Capital's calculation was in contravention of those agreements, what was authorized by the two boards, and what was disclosed to shareholders.

80.     Block, who personally performed the calculation of the T4 promote fee and conversion to ARCP OP units in a spreadsheet that he maintained on behalf of AR Capital, knew or recklessly disregarded that the manipulated calculations contravened the disclosures to shareholders, the T4 OP LPA, the T4 side letter, presentations to the T4 and ARCP boards, and information provided to the respective investment bankers retained by the T4 and ARCP boards. Block also knew or recklessly disregarded that his actions improperly inflated the number of ARCP OP units that AR Capital would receive for the promote fee, from which he would also personally benefit. As the CFO of AR Capital, Block's actions and scienter are attributable to AR Capital.

81.     Schorsch was at least negligent when he approved the use of the $22.50 denominator for the conversion and approved the T4 promote fee calculation performed by Block despite the fact that Schorsch signed the T4 side letter that specified the relevant T4 OP LPA provision that set forth the conversion formula. Schorsch was also present at all of the relevant ARCP and T4 board meetings and was aware or should have been aware that neither board had authorized the use of a different formula. Schorsch also knew or should have known that the impact from the use of a $22.50 denominator for the conversion would result in a far greater number of OP units being issued versus the cash value of the promote fee, and significantly altered the promote fee calculation from what was authorized by the agreements

and from what was disclosed to the investors in the T4 Proxy and the T4 Merger Registration Statement.

**B.  Defendants Improperly Obtained Payments Purportedly for FF&E**

82.  In connection with both the T3 and T4 mergers, Defendants directed the creation of and/or approved misleading asset purchase and sale agreements with ARCP pursuant to which ARCP would purportedly purchase from AR Capital furniture, fixtures, and equipment necessary for the T3- and T4-related post-merger operations of ARCP and reimburse AR Capital for certain "unreimbursed expenses" (the "FF&E Agreements"). Each FF&E agreement required ARCP to pay $5.8 million to AR Capital. Schorsch, on behalf of AR Capital, presented the first agreement, related to the T3 merger, to the ARCP board on December 14, 2012 ("T3 FF&E Agreement"), and the second, related to the T4 merger, to the ARCP board on July 1, 2013 ("T4 FF&E Agreement").

83.  Schorsch approved the $5.8 million price for each FF&E Agreement and knew or should have known that the $5.8 million price for each did not reflect the actual items being transferred, the cost of such items, and the actual unreimbursed expenses purportedly being reimbursed by ARCP—if any.

84.  By creating and entering into these two FF&E Agreements, Defendants arranged to receive additional cash payments totaling $11.6 million, and wrongfully obtained at least $7.27 million dollars in unsupported compensation.

85.  The T3 FF&E Agreement was an exhibit to the December 17, 2012 Form 8-K that announced the T3 merger, and the Form 8-K described that under the T3 FF&E Agreement, "concurrently with the closing of the Merger and in connection with the internalization by [ARCP] of certain property level management and accounting activities, [AR Capital] will sell to [ARCP] certain furniture, fixtures, equipment and other assets used by [AR Capital] in

connection with managing the property level business and operations and accounting functions

of [T3 and the T3 OP] at the cost of such assets, for an aggregate price of $5.8 million, which

includes the reimbursement of certain costs and expenses incurred by [AR Capital]." The

referenced "internalization" related to approximately 8 non-executive employees who would be

performing certain property level management and accounting functions for ARCP.

86.     The T3 FF&E Agreement included an exhibit of the purported "Purchased Assets

and Reimbursed Expenses." That exhibit listed items such as capitalized furniture, fixtures, and

equipment (desks, chairs, computers, software, postage and binding machines), capitalized and

other soft costs (such as marketing or software customization), and transaction costs both from

the T3 offering and the T3 merger (such as legal, accounting, investor relations, marketing,

employee handbooks, and help desk support manuals). No one from AR Capital took any

meaningful steps to confirm the accuracy of the Exhibit.

87.     Schorsch signed the Form 8-K as well as the T3 FF&E Agreement on behalf of

ARCP as its CEO.

88.     Similarly, the T4 FF&E Agreement was an exhibit to the July 2, 2013 Form 8-K

announcing the T4 merger, and the Form 8-K described that under the T4 FF&E Agreement,

"concurrently with the closing of the Merger, [AR Capital] will sell to [ARCP] certain furniture,

fixtures, equipment and other assets used by [AR Capital] in connection with managing the

property level business and operations and accounting functions of [T4 and the T4 OP], at the

cost of such assets, for an aggregate price of $5.8 million, which includes the reimbursement of

certain costs and expenses incurred by [AR Capital]." The T4 FF&E Agreement included a

purported "Purchased Assets and Reimbursed Expenses" exhibit that was identical to the exhibit

in the T3 FF&E Agreement. No one from AR Capital took any meaningful steps to confirm the accuracy of the Exhibit.

89.     Schorsch signed the Form 8-K as well as the T4 FF&E Agreement on behalf of ARCP as its CEO.

90.     The purported "Purchased Assets and Reimbursed Expenses" exhibit appended to the FF&E Agreements listing the purportedly transferred assets and expenses did not accurately reflect the items that AR Capital's accounting department (at Block's direction) recorded as being transferred.

91.     In the T4 merger, the final schedule allocating the transaction amounts between cost and expense categories in the FF&E Agreement was not completed by AR Capital's accounting department (at Block's direction) until approximately six months after AR Capital and Schorsch presented the agreement to ARCP's board for approval.

92.     Moreover, the purportedly unreimbursed expenses were far in excess of actually incurred reimbursable expenses by T3 or T4 or duplicated services that were previously reimbursed. For example, although ARCP purportedly paid AR Capital for items such as "Employee Handbook development and continuous update" and a "Process and Procedures Manual development" in the T3 FF&E Agreement, those same items were again "sold" to ARCP in the T4 FF&E Agreement.

93.     Schorsch knew or should have known that he was omitting material information when presenting the T3 and T4 FF&E Agreements to the ARCP board by not informing them that (i) the transaction amounts were determined without regard to the actual cost of the assets purchased or expenses purportedly being reimbursed, and (ii) that no one at AR Capital had taken steps to confirm the accuracy of the exhibits appended to the FF&E agreements. Schorsch

therefore knew or should have known that the T3 and T4 FF&E Agreements would result in false recordings on the books and records of ARCP with respect to the purported assets being transferred and expenses being reimbursed.

94.     Because ARCP was externally managed by AR Capital at all relevant times, AR Capital was responsible for making and keeping ARCP's financial books and records. Block, as AR Capital's CFO, knew that AR Capital had proposed the $5.8 million consideration amounts for the FF&E Agreements without regard to the actual FF&E and actual reimbursable costs or expenses incurred by AR Capital, but nevertheless proceeded to direct AR Capital employees responsible for recording entries on ARCP's books and records to falsely record the transactions in order to conceal that fact. As the CFO of AR Capital, Block's actions and scienter are attributable to AR Capital.

95.     For example, a few days after the T3 FF&E Agreement was presented to ARCP's board and received approval, Block and accounting personnel reporting to him exchanged emails to try to identify assets on AR Capital's books that could be recorded as having been transferred to ARCP. Block selected the specific assets to falsely record as transferred—including certain assets that were not actually transferred to ARCP or used by the approximately 8 internalized employees. Other purportedly transferred FF&E assets were items such as improvements to the basement of AR Capital's New York office building that AR Capital continued to own.

96.     With respect to the T4 FF&E Agreement, although the agreement was presented and signed on July 1, 2013, Block and the AR Capital accounting staff did not attempt to identify assets to be transferred or expenses to be reimbursed until after the closing of the T4 merger in January 2014. As with T3, Block selected the assets to falsely record as transferred—most of

which did not tie out to the specific items listed in the "Purchased Assets and Reimbursed

Expenses" exhibit to the agreement.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (AR Capital and Block)

97.    The Commission realleges and incorporates by reference Paragraphs 1 through

96, above.

98.    By engaging in the conduct described above, Defendants AR Capital and Block,

with scienter, directly or indirectly, by use of the means or instruments of transportation or

communication in interstate commerce, or of the mails, in connection with the offer or sale of

securities: (a) employed devices, schemes and artifices to defraud; (b) obtained money or

property by means of untrue statements of material fact, or omitted to state material facts

necessary in order to make statements made, in light of the circumstances under which they were

made, not misleading; and (c) engaged in transactions, acts, practices and courses of business

which would operate as a fraud or deceit upon the purchaser.

99.    By reason of the acts, omissions, practices, and courses of business set forth in

this Complaint, Defendants AR Capital and Block have violated, and, unless restrained and

enjoined, will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (AR Capital and Block)

100.    The Commission realleges and incorporates by reference Paragraphs 1 through

96, above.

101.    By engaging in the conduct described above, Defendants AR Capital and Block,

with scienter, directly or indirectly, by the use of any means or instrumentality of interstate

commerce or of the mails, and in connection with the purchase or sale of securities, have: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or one or more omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

102.    By reason of the acts, omissions, practices, and courses of business set forth in this Complaint, Defendants AR Capital and Block have violated, and, unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Violations of Sections 17(a)(2) and (a)(3) of the Securities Act
(Schorsch)**

103.    The Commission realleges and incorporates by reference Paragraphs 1 through 96, above.

104.    By engaging in the conduct described above, Defendant Schorsch, acting at least negligently, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the offer or sale of securities: (i) obtained money or property by means of untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (ii) engaged in transactions, acts, practices and courses of business which would operate as a fraud or deceit upon the purchaser.

105.    By reason of the acts, omissions, practices, and courses of business set forth in this Complaint, Defendant Schorsch has violated, and, unless restrained and enjoined, will continue to violate, Sections 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (a)(3)].

### FOURTH CLAIM FOR RELIEF
### Violations of Section 13(b)(5) of the Exchange Act
### (AR Capital and Block)

106.    The Commission realleges and incorporates by reference Paragraphs 1 through 96, above.

107.    By engaging in the conduct described above, Defendants AR Capital and Block, knowingly falsified books, records and accounts of ARCP that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

108.    As a result, Defendants AR Capital and Block have violated, and, unless restrained and enjoined, will continue to violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(2)(5)].

### FIFTH CLAIM FOR RELIEF
### Violations of Exchange Act Rule 13b2-1
### (All Defendants)

109.    The Commission realleges and incorporates by reference Paragraphs 1 through 96, above.

110.    By engaging in the conduct described above, Defendants AR Capital, Block, and Schorsch, directly or indirectly, falsified or caused to be falsified, books, records and accounts of ARCP that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

111.    As a result, Defendants AR Capital, Block, and Schorsch have violated, and, unless restrained and enjoined, will continue to violate, Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining AR Capital and Block, and each of their agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### II.

Permanently enjoining AR Capital and Block, and each of their agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 10(b) of the Exchange Act, [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Permanently enjoining AR Capital and Block, and each of their agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 13(b)(5) of the Exchange Act, [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

### IV.

Permanently enjoining Schorsch, and each of his agents, servants, employees, attorneys and other persons in active concert or participation with him who receive actual notice of the injunction

by personal service or otherwise from violating Sections 17(a)(2) and (a)(3) of the Securities Act

[15 U.S.C. § 77q(a)(2) and (a)(3)].

## V.

Permanently enjoining Schorsch, and each of his agents, servants, employees, attorneys and

other persons in active concert or participation with him who receive actual notice of the injunction

by personal service or otherwise from violating Exchange Act Rule 13b2-1 [17 C.F.R.

§ 240.13b2-1].

## VI.

Ordering AR Capital, Schorsch, and Block to disgorge ill-gotten gains received from the

conduct alleged in this Complaint and to pay prejudgment interest thereon.

## VII.

Ordering AR Capital, Schorsch, and Block to pay civil money penalties pursuant to Section

20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act

[15 U.S.C. § 78u(d)(3)].

## VIII.

Granting such other and further relief as this Court deems just and appropriate.


Dated: July 16, 2019
       New York, New York

By: _____

Marc P. Berger
Sanjay Wadhwa
Wendy B. Tepperman
Nancy A. Brown
Janna Berke
Hane Kim
Victor Suthammanont
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)
Email: BrownN@sec.gov