UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

AR CAPITAL, LLC, NICHOLAS S. SCHORSCH
and BRIAN S. BLOCK,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _5/18/2021_

19 Civ. 6603 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Before the Court is Plaintiff, the Security and Exchange Commission's (the "SEC"), motion

for approval of a proposed plan of distribution of the funds in the fair fund established in this action

(the "Fair Fund"), ECF No. 41, and Vereit, Inc.'s objections to the proposed plan, ECF No. 45. For

the reasons stated below, Vereit Inc.'s objections are OVERRULED and the SEC's motion is

GRANTED.

## BACKGROUND[1]

I.     Alleged Fraudulent Conduct

The SEC brought this action against Defendants AR Capital, LLC (along with its wholly-

owned subsidiaries, "AR Capital"), Nicholas S. Schorsch, and Brian S. Block. Compl. ¶¶ 10–12. AR

Capital was, at all relevant times, the external manager of the real estate investment trust ("REIT")

American Realty Capital Properties, Inc., a Maryland corporation, which was renamed Vereit, Inc. in

---

[1] Simultaneously to the filing of the complaint, Defendants consented to the Court's entry of judgment "[w]ithout admitting or denying the allegations of the complaint." ECF Nos. 5 ¶ 2, 6 ¶ 2, 7 ¶ 2. Nevertheless, because the Court must give some background, and both the SEC and Vereit, Inc., cite to the complaint in their briefing, ECF Nos. 42, 45, the Court will rely on the complaint's recitation of the facts, realizing that Defendants have not conceded any of these events occurred. *Sec. & Exch. Comm'n v. J.P. Morgan Sec. LLC*, No. 12 Civ. 1862, 2017 WL 44209, at *1 (D.D.C. Jan. 4, 2017).

2015 ("Vereit")[2].  *Id.* ¶ 13.  Schorsch was owner of AR Capital and Chairman of Vereit, and Block was CFO of Vereit.  *Id.* ¶¶ 11–12.

AR Capital's business consisted of creating and managing REITs, from which it received certain fees for activities such as mergers, sales, and public listings.  *Id*. ¶ 16.  In late 2012, in addition to Vereit, which was publicly traded as of 2011, AR Capital also managed the non-publicly traded REITs T3 and T4, of which Schorsch was also CEO and Chairman.  *Id*. ¶¶ 13–15, 17.  Each REIT was structured as a corporation with an affiliated operating partnership, with the REIT acting as the general partner of the operating partnership, pursuant to limited partnership agreements (the "LPAs"), and owning a majority of units of the partnership on a 1:1 basis of the outstanding shares of the REIT stock.  *Id.* ¶¶ 17–18.

Pursuant to the T3 and T4 LPAs, if, upon a liquidity event such as a merger or sale, shareholders received a return above six percent, AR Capital would receive 15 percent of the amount above six percent as a "promote fee".  *Id.* ¶ 21.  This return would be measured using the fair market value of the REITs' shares on the date of the liquidity event.  *Id.*

The SEC alleges that Defendants perpetuated their fraud in connection with the mergers of Vereit with T3 and T4.  Vereit and T3 entered into a merger agreement on December 14, 2012, and announced the merger through various means, including in a form filed with the SEC, on December 7, 2012, contingent on approval by a majority of Vereit and T3 shareholders.  Compl. ¶¶ 25, 29, 30.  On January 22, 2013, Vereit and T3 filed a joint proxy statement with the SEC.  On February 26, 2013, a majority of shareholders approved the transaction, and the merger closed on February 28, 2013.  *Id.* ¶¶ 30, 34.  Four months later, on July 1, 2013, Vereit and T4 entered into a merger agreement that was, in relevant respects, identical to the agreement between Vereit and T3, and was also contingent on shareholder approval.  *Id.* ¶¶ 63, 68.  The merger was announced on July 2, 2013,

---

[2] To avoid confusion, the Court refers to the entity as Vereit at all time periods, including before its name change.

including through forms filed with the SEC, and T4 and Vereit issued proxy statements on December 4, 2013. *Id.* ¶¶ 67–68. The merger closed on January 3, 2014. *Id.* ¶ 74.

In each of these mergers, AR Capital was to take its promote fee in units of the T3 or T4 partnership, based on a formula determined by the fair market value that determined the shareholders' return. *Id.* ¶ 22. These units, in turn, would be converted to units of the Vereit partnership in the merger. *Id.*

However, contrary to the disclosures to the shareholders, and the merger agreements approved by the shareholders, Defendants changed the method of calculating the return to investors from which the promote fee was calculated, resulting in AR Capital receiving approximately three million more units of Vereit's partnership than it was entitled, valued at $31,972,934. Compl. ¶¶ 35–55, 72–78; ECF No. 51-2 ¶ 7. Defendants, in disclosures and annual reports, misrepresented to the SEC that they were entitled to these shares. Compl. ¶¶ 58–60, 77–79.

In addition, in connection with the mergers, Defendants caused Vereit and AR Capital to execute asset purchase and sale agreements, pursuant to which Vereit would purchase from AR Capital certain furniture, fixtures, and equipment "necessary for the T3- and T4-related post-merger operations of [Vereit]," for $5.8 million per agreement—a price that did not reflect the actual value of the items being transferred. *Id.* ¶¶ 82–83. These agreements were exhibits to the disclosures announcing the mergers. *Id.* ¶¶ 85, 88.

II.     Events Subsequent to the Alleged Fraud

On October 29, 2014, Vereit announced that reports and other documents for the fiscal year ending in December 31, 2013, and for the first and second quarters of the fiscal year 2014, should no longer be relied on, based on fraud unrelated to the conduct at issue here. October 29, 2014 Form 8-K, ECF No. 45-2 at 3. Vereit's shares dropped following this announcement, for a market capitalization loss of over $2 billion. SEC Mem. at 6, ECF No. 42. In December 2014, Vereit

announced that Schorsch was resigning and Vereit would be unwinding its relationships with all entities affiliated with Schorsch, causing a further drop in share price.  SEC Mem. at 6.

Beginning in 2015, Vereit shareholders brought a number of class action and derivative suits, all of which settled by January 22, 2020, in agreements encompassing shareholders, Vereit, and Defendants.  *In re American Realty Capital Properties, Inc. Litigation*, No. 15 Misc. 40 (S.D.N.Y. Jan. 23, 2020), ECF No. 1312; *Witchko v. Schorsch*, No. 15 Civ. 6043 (S.D.N.Y. Jan. 22, 2020), ECF No. 309.

The SEC brought claims against Defendants on July 16, 2019, alleging violations of § 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and § 13(b)(5) of the Exchange Act and Rule 13b2-1 promulgated thereunder, 17 C.F.R. § 240.13b2-1.  Compl. ¶¶ 97–111.  On the same day, the SEC filed the consents of Defendants to proposed final judgments, ECF Nos. 5–7, 10, which the Court entered. ECF Nos. 8–9, 11.

The judgments rendered Defendants liable for cash disgorgement and civil penalties, which have all now been paid to the Fair Fund held by the SEC.  ECF Nos. 8–9, 11; SEC Mem. at 4.  In total, the Fund holds $34,063,856, of which $12,313,856 is disgorgement and prejudgment interest, and $21,750,000 is civil penalties.  SEC Mem. at 3–4.

In addition, the AR Capital judgment required AR Capital to disgorge 2,922,445 of Vereit's partnership units to Vereit, which Vereit then cancelled.  ECF No. 9 at 4; SEC Mem. at 3 n.2. Pursuant to the settlement agreement in the derivative and class actions, Vereit agreed to offset Defendants' payment to the settlement fund with the value of those units.  ECF Nos. 51-2 ¶ 1, 51-3 ¶ 1.

III.    The Distribution Plan

The consent judgments permit the SEC to propose a plan for distribution of these funds subject to the Court's approval.  ECF Nos. 8 at 5, 9 at 6, 11 at 6.  On September 14, 2020, the SEC filed its motion for the Court to approve its distribution plan (the "Plan").  ECF No. 41.

The SEC's plan, made in discussion with the Court-appointed distribution agent, proposes to distribute the funds on a *pro rata* basis to those investors who purchased or acquired shares of Vereit common stock between February 28, 2013 (the closing date of the T3 merger) and October 28, 2014, and held the shares through the close of trading on October 28, 2014.  Plan ¶ 52, ECF No. 42-1.

On October 13, 2020, Vereit filed objections to the Plan.

## DISCUSSION

I.    Legal Standard

A Court reviews the SEC's proposed distribution plan to determine whether it is "is fair and reasonable."  *SEC v. Wang*, 944 F.2d 80, 83–85 (2d Cir. 1991) ("[O]nce the district court satisfies itself that the distribution of proceeds in a proposed SEC disgorgement plan is fair and reasonable, its review is at an end." (alterations omitted)); *see also SEC v. Byers*, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009).  "In making its decision, a court may defer to the receiver's choices for the plan's details and should give substantial weight to the SEC's views regarding a plan's merits."  *SEC v. Amerindo Inv. Advisors Inc*., No. 05 Civ. 5231, 2017 WL 3017504, at *2 (S.D.N.Y. July 14, 2017) (alteration and citation omitted); *see also Byers*, 637 F. Supp. at 175 ("The SEC's judgment is entitled to deference from this Court.").

II.    Objections

Vereit makes two overarching objections to the Plan: first, that Vereit should receive the disgorged funds (the "Funds"), not Vereit's shareholders, and second, that the Plan itself is not fair and reasonable to the shareholders.[3]

A. Vereit and the Disgorged Funds

Vereit objects that it should receive the Funds because, in effect, it is the true victim of Defendants' actions.  Vereit Mem. at 15–20.  Initially, Vereit argues that the Supreme Court's decision in *United States v. Liu*, 140 S. Ct. 1936 (2020), requires the Court to "confine any award of disgorgement to traditional equitable remedies."  Vereit Mem. at 14.  Therefore, Vereit argues, because it would be the recipient of the Funds "[u]nder any equitable doctrine that could possibly be invoked here," Vereit must receive the Funds.  *Id.* at 15.

The Court does not read *Liu* so broadly.  In *Liu*, the Supreme Court held that disgorgement was a permissible remedy under 15 U.S.C. § 78u(d)(5).  140 S. Ct. at 1940.  It reasoned that because disgorgement was a permissible remedy in traditional equity courts, it was also available to the SEC. *Id.* at 1942–45.  In addition, because "courts have occasionally awarded disgorgement in three main ways that test the bounds of equity practice: by ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims, imposing joint-and-several disgorgement liability, and declining to deduct even legitimate expenses from the receipts of fraud," the Court ruled those practices impermissible.  *Id.* at 1946–48.  It did not, however, further limit the disgorgement remedy.  *See SEC v. Cope*, No. 14 Civ. 7575, 2021 WL 653088, at *2 (S.D.N.Y. Feb. 19, 2021) ("The Court . . . set forth several principles to guide the lower courts in developing appropriate disgorgement orders in SEC enforcement actions . . . ." (quotation marks, alterations, and citations

---

[3] Vereit objects only to the portion of the Fair Fund which constitutes disgorged funds, and takes no position on the disposition of the civil penalties.  Vereit Mem. at 4, ECF No. 45.

omitted)). As long as the Plan returns the Funds to "victims," therefore, it does not run afoul of *Liu*. *Id.* ("While *Liu* limited to a certain extent the scope of the disgorgement remedy, a district court retains broad equitable power to fashion appropriate remedies for federal securities law violations." (quotation marks and citation omitted)).

The Court concludes that Vereit's shareholders are independent victims of Defendants' scheme. The complaint filed in this action contemplates that the Defendants made misrepresentations directly to shareholders, to whom Defendants owed an independent fiduciary duty. Compl. ¶¶ 3, 22–23, 30–33, 35, 42, 53, 61, 68–70, 72; *see Strougo v. Bassini*, 282 F.3d 162, 173 (2d Cir. 2002). The SEC and the distribution agent determined that investors were harmed by Defendants' fraud. SEC Mem. at 10; *Byers*, 637 F. Supp. 2d at 175. Moreover, the doctrine of piercing the corporate veil does not foreclose the SEC from considering shareholders of an extant company as victims and so distributing funds directly to them. *See, e.g.*, *SEC v. Brant*, No. 7 Civ. 1075 (S.D.N.Y.), ECF Nos. 1 at 9–13, 29, 36 (approving a distribution plan to a company's shareholders where the CEO of the company had a judgment entered against him for, *inter alia*, claims of Securities Act § 17(a), Exchange Act § 10(b) and Rule 10b-5, and Exchange Act 13(b) violations). Therefore, Vereit's shareholders are reasonably considered victims under *Liu*.

In addition, the SEC's choice to disburse the Funds to investors rather than Vereit is fair and reasonable. The cases cited by Vereit, although establishing that the SEC *may* disburse the Funds directly back to the company of a defendant, do not establish that the SEC *must* disburse the Funds back to the company. Vereit Mem. at 15–16; *compare SEC v. Gupta*, No. 10 Civ. 100 (D. Neb. Mar. 9, 2010), ECF No. 9 at 6 (reimbursing defendant's company as agreed upon in a consent judgment) *with Brant*, No. 7 Civ. 1075, ECF No. 29; *S.E.C. v. Drexel Burnham Lambert, Inc.*, 956 F. Supp. 503, 506 (S.D.N.Y. 1997) ("[I]t is the policy of the SEC whenever possible to recommend a distribution

plan by which a defendant's unlawful gains are paid out to defrauded investors"), *aff'd sub nom.*

*S.E.C. v. Fischbach Corp.*, 133 F.3d 170 (2d Cir. 1997).

Vereit argues that, because it can trace the Funds to the money misappropriated from it through the asset purchase and sale agreements, it is entitled to them. Vereit Mem. at 15–17. However, "[t]racing analysis . . . has been almost universally rejected by courts as inequitable." *Byers*, 637 F. Supp. 2d at 177; *see also Credit Bancorp, Ltd.*, 2000 WL 1752979 at *14 ("[W]hile a court sitting in equity may allow tracing, there is no entitlement on the part of a defrauded customer to that measure."). When tracing is applied, "the difference between those who get more and those who get less is a 'fortuity,'" based on the timing of whose funds happened to be used when. *S.E.C. v. Enter. Tr. Co.*, No. 08 Civ. 1260, 2008 WL 4534154, at *4 (N.D. Ill. Oct. 7, 2008), *aff'd*, 559 F.3d 649 (7th Cir. 2009) (quoting *Credit Bancorp, Ltd.*, 2000 WL 1752979, at *15–16). Therefore, "[i]n equity, remedies to which claimants might be entitled to under other law may be suspended if such a measure is consistent with treating all claimants fairly." *Credit Bancorp, Ltd.*, 2000 WL 1752979, at *28, *see also id.* at *15 ("To allow any individual to elevate his position over that of other investors similarly 'victimized' by asserting claims for restitution and/or reclamation of specific assets based upon equitable theories of relief such as fraud, misrepresentation, theft, etc. would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less." (alteration and citation omitted)).

Here, Vereit has already received a value of $31,972,934 in the disgorgement of Vereit partnership units, nearly 70 percent of what it claims. SEC Reply at 19, ECF No. 50. By contrast, some of the investors would not receive any reimbursement if not for the Fund, particularly those who have now sold their stock in Vereit. *See S.E.C. v. Worldcom, Inc.*, No. 02 Civ. 4963, 2004 WL 1621185, at *2 (S.D.N.Y. July 20, 2004) ("[I]t is fair and reasonable that the limited funds available for distribution not be directed to those who have already recovered more than the approximately 36

cents on the dollar recovered by general creditors, and rather be used to increase the still-considerably smaller recovery of those covered by the proposed Distribution Plan."), *aff'd sub nom. Official Comm. of Unsecured Creditors of WorldCom, Inc.*, 467 F.3d 73 (2d Cir. 2006). Were Vereit to receive the Funds, that would be inconsistent with the principle that "similarly-situated investors [be] treated alike." *Credit Bancorp, Ltd.*, 2000 WL 1752979, at *28. Those investors who sold their Vereit shares sometime after October 28, 2014, would receive nothing, and those who retained their shares would receive more through Vereit. *Drexel Burnham Lambert, Inc*., 956 F. Supp. at 507–08 (concluding it would not be fair and reasonable to distribute funds to the company from which the defendant took money, when it had since been acquired by a different company and to award funds to the acquiree would be a windfall and "do nothing to compensate those persons directly damaged" by the defendants' action). Moreover, Vereit, in its position as shareholder defrauded by Defendants, would also be treated differently by receiving the entirety of the Funds. In addition, although Vereit had the option of suing Defendants directly, it decided not to do so, thus harming its equitable position. *Witchko v. Schorsch*, No. 15 Civ. 6043, 2016 WL 3887289, at *2 (S.D.N.Y. June 9, 2016).

Therefore, the Court concludes it was fair and reasonable of the SEC to determine that the investors were the proper recipients of the Funds. *See SEC v. CR Intrinsic Investors, LLC*, 164 F. Supp. 3d 433, 435 (S.D.N.Y. 2016) ("[N]early every plan to distribute funds obtained in an [SEC] enforcement action requires choices to be made regarding the allocation of funds between and among potential claimants within the parameters of the amounts recovered." (quotation marks omitted)); *Wang*, 944 F.2d at 85 ("This kind of line-drawing—which inevitably leaves out some potential claimants—is, unless commanded otherwise by the terms of a consent decree, appropriately left to the experience and expertise of the SEC in the first instance.").

## B. The Plan's Fairness and Reasonableness

Vereit also objects to (1) the dates used to define the class of investors receiving the Funds, and (2) the method of distribution. Vereit Mem. at 21–23. The Court, however, concludes the SEC's composition and distribution method are reasonable.

First, Vereit asserts that the SEC chose its definition of the recipients of the Funds (those who purchased Vereit shares between February 28, 2013, to October 28, 2014) simply because the dates corresponded to the unrelated class action brought against Vereit. Vereit Mem. at 21. Vereit argues that (1) this definition excludes individuals who had purchased shares before February 28, 2013, but held them on that date, *id.* at 21, and (2) the end date, which corresponds to disclosures that unrelated fraud had occurred, has nothing to do with the wrongdoing alleged in this action, *id.* at 22–23. However, the SEC offers a sound rationale for these dates: it opted for a definition beginning with those who purchased shares after February 28, 2013—the date of the closing of the T3 merger— because investors who bought shares before February 28, 2013, could not bring a securities fraud claim against Vereit; it chose October 28, 2014, as an end date because it was the first announcement of fraud, though mostly unrelated, and the precipitous stock price drop. SEC Reply at 12–14.

"Determining a cutoff date is quintessential 'line-drawing' appropriately left to the discretion of the [SEC]." *Sec. & Exch. Comm'n v. J.P. Morgan Sec. LLC*, 266 F. Supp. 3d 225, 232 (D.D.C. 2017) (quoting *Wang*, 944 F.2d at 88). Moreover, these dates are reasonable: courts have held both beginning when the investors would be able to bring suit against Vereit, and ending when the fraud began to have less effect, to be reasonable. *Id.* at 233 ("[T]he point is not to measure when precisely the full details of Defendants' conduct was revealed, but to ascertain a reasonable point in time when non-disclosures had significantly less effect on new investment decisions."); *Worldcom, Inc.*, 2004 WL 1621185, at *2 ("[I]t can hardly be unfair to exclude a group that, under existing securities law, could not even bring a securities fraud claim directly against [the issuer].").

Second, Vereit objects that the Plan distributes the Funds on a purely *pro rata* basis, rather than taking into account the different amounts appropriated over time. Vereit Mem. at 22. Courts approve *pro rata* distribution where investors' funds have been commingled, and the victims are "similarly situated with respect to their relationship to the defrauders." *Byers*, 637 F. Supp. 2d at 177 (quotation marks and citation omitted). Here, the Funds, gained indirectly through investments, were commingled. Moreover, the investors, though not identically situated due to their acquiring the funds at different times, have enough of a "reasonably close resemblance of facts and circumstances" to be considered similarly situated. *Id.* at 180 (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001)). Therefore, *pro rata* distribution is reasonable here. *See also id.* at 177 (cautioning against "rewarding certain investors over others based on arbitrary factors.").

Accordingly, the Court concludes that the Plan is fair and reasonable.

## CONCLUSION

For the reasons stated above, Vereit's objections are OVERRULED. The SEC's motion to approve the Plan is GRANTED, and the Court approves in its entirety the Distribution Plan attached hereto. The Distribution Plan shall govern the administration and distribution of the Fair Fund previously established by Order entered October 22, 2019.

SO ORDERED.

Dated: May 18, 2021
New York, New York

_____
ANALISA TORRES
United States District Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | 19 Civ. 6603 (AT) |
| Plaintiff, | |
| -- against -- | |
| AR CAPITAL, LLC, NICHOLAS S. SCHORSCH and BRIAN S. BLOCK, | |
| Defendants. | |

## DISTRIBUTION PLAN

## I.    Introduction

1. The Securities and Exchange Commission submits this proposed plan of distribution for the distribution of funds paid in the above captioned action to compensate shareholders harmed by Defendants violations of the federal securities laws by making material misstatements and omissions and engaging in other improper conduct in connection with two mergers in 2013 and 2014 involving American Realty Capital Properties, Inc. ("ARCP") (now known as VEREIT, Inc.) and improperly obtained millions of dollars from their violations.

2. On July 16, 2019, the SEC filed a Complaint against AR Capital, LLC, ("AR Capital"), Nicholas S. Schorsch ("Schorsch"), and Brian S. Block ("Block" and collectively, with AR Capital and Schorsch, the "Defendants") (the "SEC Complaint"). As alleged in the Complaint, AR Capital sponsored and externally managed REITs, including ARCP and two publicly held, non-traded REITs: American Realty Capital Trust III, Inc. ("T3") and American Realty Capital Trust IV, Inc. ("T4"). ARCP completed a merger with T3 in February 2013 (the "T3 Merger"), and with T4 in January 2014 (the "T4 Merger").

3. The Complaint further alleged that contrary to shareholder disclosures, Defendant AR Capital, acting through Block and Schorsch, inflated several aspects of an incentive fees "that enriched the Defendants at the expense of the REITs and their shareholders," which resulted in Defendants' collecting a total of 2,922,445 ARCP operating partnership units ("OP units") to which they were not entitled and that Defendants made additional related misstatements in subsequent ARCP public filings with the Commission, including in quarterly and annual reports on Forms 10-K and 10-Q.

4. The SEC Complaint also alleged that Defendants' misleading presentation of agreements— purportedly for purchasing furniture, fixtures, and equipment necessary for the respective T3

or T4-related post-merger operations and reimbursing AR Capital for certain "unreimbursed expenses"— in public filings with the SEC, resulted in the Defendants wrongfully obtaining at least $7.27 million in unsupported compensation. The SEC complaint alleged the Defendants' actions relating to these agreements also resulted in recording false entries on VEREIT's books and records.

5. Without admitting or denying the allegations in the SEC Complaint, the Defendants consented to the entry of final judgments against them. AR Capital was ordered liable for disgorgement, "representing profits gained as a result of conduct alleged in the Complaint," of 2,922,445 OP units and $11,275,065 plus prejudgment interest thereon of $1,038,791. The Schorsch and Block final judgments ordered each liable on a joint-and-several basis with AR Capital for certain amounts of the disgorgement. The final judgments also ordered payment of civil penalties of $14,000,000 against AR Capital, $7,000,000 against Schorsch, and $750,000 against Block. (DE 8, 9, 11.) The Final Judgments required the Defendants to satisfy the disgorgement obligation with respect to the OP units by the surrender and return of such OP units to ARCP for cancellation and by the payment of cash disgorgement, prejudgment interest, and civil penalties to the SEC. In July 2019, Defendants paid the cash disgorgement, prejudgment interest, and penalties to the Commission and surrendered the OP units as required by the judgments.

6. The cash disgorgement, prejudgment interest, and penalties paid to the Commission is currently invested at the Bureau of the Fiscal Service ("BFS") at the United States Department of the Treasury. Any investment fees of the BFS will be paid by the Fair Fund.

7. By Order dated October 22, 2019, the Court created a Fair Fund pursuant to Section 308(a) of Sarbanes-Oxley, as amended, and appointed Miller Kaplan Arase LLP ("MKA") as Tax Administrator to execute all income tax reporting requirements, including the preparation and filing of tax returns for all funds under the Court's jurisdiction in this case. By Order dated April 16, 2020, the Court appointed Kurtzman Carson Consultants, LLC ("KCC" or "Distribution Agent") to serve as the Distribution Agent to oversee the administration and distribution of the Fair Fund, in coordination with the Commission staff, and in accordance with the terms of a distribution plan to be approved by the Court.

8. This Distribution Plan was developed jointly by the Distribution Agent and the Commission staff in accordance with practices and procedures customary in Commission Fair Fund distributions. This Distribution Plan governs the administration and distribution of the Fair Fund, and sets forth the method and procedures for distributing the assets of the Fair Fund to certain ARCP investors harmed by the misconduct.

9. Separately, on January 22, 2020, a settlement was approved in the action *In re American Realty Capital Properties, Inc. Litigation*, Civil Action No. 1:15-mc-00040-AKH in the United States District Court, Southern District of New York (the "Class Action"). By Order dated October 4, 2019, Gilardi & Co. LLC[1] was appointed Claims Administrator in the Class

---

[1] KCC LLC acquired class action claims administrator Gilardi & Co. LLC in August 2015.

Action. In an effort reduce the burden to Class Action Claimants, while also streamlining the administration, reducing costs and maximizing the amount of the Fair Fund available for distribution the Distribution Agent will leverage the data from claims filed in the Class Action. Further details are provided below.

## II.    <u>Definitions</u>

10.    As used in this Distribution Plan, the following definitions shall apply:

    a.    "**Check-cashing Period**" means the ninety (90) days following the mailing of Distribution Payment checks to Eligible Claimants in accordance with this Distribution Plan.

    b.    "**Claim Form**" means the form designed by the Distribution Agent for the filing of claims in accordance with the terms of this Distribution Plan. The Claim Form will require, at a minimum, sufficient documentation reflecting any Potential Claimant's acquisitions and dispositions of the Eligible Security during the Relevant Period.

    c.    "**Claimant**" means a Class Action Claimant *or* a Potential Claimant who files a Claim Form in this action by the Claims Filing Deadline.

    d.    "**Claims Filing Deadline**" means the date established in accordance with this Distribution Plan by which a Potential Claimant's Claim Form must be filed to avoid the denial of any right of the Potentially Eligible Claimant to participate in any distribution from the Net Available Fair Fund. The Claims Filing Deadline shall be one hundred and twenty (120) days after the Initial Mailing.

    e.    "**Class Action**" or "**Class Action Settlement**" means the settlement reached in connection with the *In re American Realty Capital Properties, Inc., Litigation*, Civil Action No. 1:15-mc-00040-AKH before the United States District Court for the Southern District of New York.

    f.    "**Class Action Claimants**" means investors that filed claims in the Class Action administration.

    g.    "**Days**" means calendar days, unless otherwise specified herein.

    h.    "*De Minimis* **Amount**" means the minimum preliminary calculation amount of $10.00. No Eligible Claimant shall receive a distribution payment unless the preliminary calculation is equal to or greater than $10.00.

    i.    "**Determination Notice**" means the Notice sent to Claimants indicating the status of the claim, whether eligible or rejected in whole or in part, and providing information as described further below in the section titled "Claims Determination Processes."

    j.    "**Distribution Agent**" refers to KCC (collectively with all employees, agents, consultants, or independent contractors of such firm), which has been appointed by the Court to administer and distribute the Fair Fund in accordance with the terms of this Distribution Plan and the Court's orders.

    k.    "**Distribution Payment**" means the payment to an Eligible Claimant in accordance with the Plan. The Distribution Payment for an Eligible Claimant will be calculated in a *pro rata* fashion in accordance with the Plan of Allocation.

    l.    "**Distribution Plan" or the "Plan**" means this Distribution Plan in the form approved by the Court.

m. "**Eligible Claimant**" means a Claimant who purchased or otherwise acquired ARCP common stock on or after February 28, 2013, including in the T3 Merger, and held that stock at the close of trading October 28, 2014, except for Excluded Parties.

n. "**Eligible Security**" means common stock of American Realty Capital Properties, Inc., traded under the ticker "ARCP" on NASDAQ's Global Select Market purchased or otherwise acquired during the Relevant Period.

o. "**Eligible Share**" means one (1) share of an Eligible Security held through the close of trading on October 28, 2014. In the plural, Eligible Shares means two (2) or a higher number of Eligible Securities held through the close of trading on October 28, 2014.

p. "**Excluded Parties**" shall mean the Defendants to this action, the Defendants to the Class Action, American Realty Capital Properties, Inc., American Realty Capital Trust III, Inc. and American Realty Capital Trust IV, Inc., and any parents, subsidiaries, directors, members, partners, and employees, and any assigns, heirs, spouses, parents, dependents or controlled entity(ies) of the foregoing; and the Distribution Agent, its employees, and those persons assisting the Distribution Agent in its role as Distribution Agent.

q. "**Fair Fund**" refers to the $34,063,856 fund created by the Court pursuant to the provisions of Sarbanes-Oxley, as amended, and pursuant to the final judgments, plus any accumulated interest or earnings thereon or any additions thereto as may be provided by future Court order or agreement in related cases or otherwise.

r. "**Fair Fund Notice**" means a written notice from the Distribution Agent to Potential Claimants informing them of the Fair Fund and its eligibility requirements, and explaining how to submit a claim. The notice will be both mailed and posted to the website according to the schedule detailed herein.

s. "**Initial Mailing**" means, per the terms of the Plan and as further described below, the mailing of the Postcard Notice to Class Action Claimants and the Notice Packet to Potential Claimants, collectively. The Initial Mailing is to take place within sixty (60) days following the entry by this Court of an Order approving this Distribution Plan.

t. "**Net Available Fair Fund**" means the Fair Fund, less any amounts expended for tax obligations, fees and expenses of the Distribution Agent and Tax Administrator, and the fees of the Bureau of Fiscal Services in accordance with this Distribution Plan.

u. "**Notice of Publication**" means the publication of the Fair Fund Notice, or a notice closely resembling the Fair Fund Notice, in print, *PR Newswire* or internet media in a manner deemed appropriate by the Distribution Agent and not unacceptable to the Commission staff. Such notice (the text of which shall be approved by the Commission staff) shall include, at a minimum, a statement that the Fair Fund relates to shares of ARCP common stock purchased or otherwise acquired during the Relevant Period and held at the close of trading October 28, 2014, and the means of obtaining a Notice Packet.

v. "**Notice Packet**" means the materials relevant to submitting a claim that may be provided to Potential Claimants known to the Distribution Agent or to those who obtain such materials through a website or other appropriate delivery mechanisms.

These materials will include a copy of the Fair Fund Notice and a Claim Form (together with instructions for completion of the Claim Form).

w. "**Person**" means natural individuals as well as legal entities including, but not limited to, corporations, partnerships, limited liability companies, and governmental entities.

x. "**Plan of Allocation**" means the methodology by which a Claimant's Eligible Share Amount is calculated. The Plan of Allocation is set forth in Appendix 1 and attached hereto.

y. "**Postcard Notice**" means the written notice sent to Class Action Claimants informing them of the Fair Fund and the fact that the data already submitted in connection with the Class Action will be used to determine the Class Action Claimant's eligibility for the Fair Fund.

z. "**Potential Claimant**" means an individual or entity, or their lawful successors, who purchased or acquired ARCP common stock during the Relevant Period, but is not a Class Action Claimant.

aa. "**Relevant Period**" means February 28, 2013, through and including October 28, 2014.

bb. "**Request for Reconsideration Deadline**" shall mean the date established in accordance with this Plan by which a Claimant's request to reconsider a Determination Notice must be filed to challenge the Determination Notice. Subject to certain extensions provided for in this Plan, the deadline to file such requests shall be twenty (20) days from the date of Determination Notice.

cc. "**Tax Administrator**" means Miller Kaplan and Arase LLP, formerly known as Damasco & Associates LLP, the firm appointed by the Court on October 22, 2019, as the Tax Administrator in this action.

dd. "**Third-Party Filer**" means a third-party, including without limitation a nominee, custodian, or an intermediary holding in street name, who is authorized to, and submits, a claim(s) on behalf of one or more potentially eligible Claimants. Third-Party Filer does not include assignees or purchasers of claims, which are excluded from receiving distribution payments.

## III. Administration of the Fair Fund

### A. Identification of and Notice to Potential Claimants and Class Action Claimants

11. Upon approval by the Commission staff, KCC will compile information for all Class Action Claimants, including the name, address, and ARCP common stock transactions and holding information filed in the Class Action.

12. The Distribution Agent will design and submit a Postcard Notice to the Commission staff for review and approval.

13. The Distribution Agent will design and submit a Notice Packet, including a Fair Fund Notice and a Claim Form, to the Commission staff for review and approval.

14. The Distribution Agent will create a mailing database consisting of the records of all Class Action Claimants, of all known opt-outs from the Class Action, and of Persons that acquired shares via the T3 merger provided by Commission staff.

15. Before commencing any mailing, the Distribution Agent will run a National Change of Address search to obtain updated addresses for all Class Action Claimants and Potential Claimants recorded in the database.

16. The Distribution Agent will mail Notice Packets to Persons that acquired shares via the T3 merger and to other known Potential Claimants, including known Persons that opted out of the Class Action, and will mail Postcard Notices to Class Action Claimants.

17. The Distribution Agent will commence mailing the Notice Packet to all Potential Claimants known to the Distribution Agent and will mail a Postcard Notice to all Class Action Claimants[2] within sixty days (60) days following the entry by this Court of an Order approving this Distribution Plan (the "Initial Mailing"). Each Notice Packet will notify the Potential Claimant of the Fair Fund, contain a brief description of the eligibility requirements, generally describe the Fair Fund's claim and distribution processes, explain how to obtain a copy of the approved Distribution Plan and Claim Form by request or from the Fair Fund website, and provide instructions for submitting a claim. The Postcard Notice will notify Class Action Claimants that they do not need to file new claims for the Fair Fund, but will have their Class Action claims carried over and re-evaluated based on the Fair Fund Plan of Allocation.

18. Notice Packets will be available on the Fair Fund website to view and download. Additionally, the Distribution Agent shall continue to supply the Notice Packet to Persons who contact the Distribution Agent requesting a copy via mail, phone or e-mail.

19. Within ten (10) days of the Initial Mailing, the Distribution Agent will carry out the Notice of Publication, which will notify the public of the Fair Fund, contain a brief description of the eligibility requirements, generally describe the Fair Fund's claim and distribution processes, explain how to obtain a copy of the approved Distribution Plan and Notice Packet by request or from the Fair Fund website, and provide instructions for submitting a claim.

20. The Distribution Agent will establish and maintain a website devoted solely to the Fair Fund. The Fair Fund website, located at www.ARCapitalFairFund.com, will make available a copy of the Notice Packet, the approved Distribution Plan, and other court documents. Further, the website will provide information regarding the claims process and eligibility requirements for participation in the Fair Fund, and such other information covering process or substance that the Distribution Agent believes will be beneficial to Class Action Claimants and Potential Claimants. The Commission staff retains the right to review and approve any material posted on the Fair Fund website.

---

[2] For Class Action Claims that were filed electronically by a nominee, broker or Third-Party Filer, the Postcard Notice will be transmitted via email to the nominee, broker or Third-Party Filer.

21. The Distribution Agent will provide a copy of the Distribution Plan and Fair Fund Notice to the staff of the Commission who will post the Distribution Plan and Fair Fund Notice on the Information for Harmed Investors page of www.sec.gov and establish a link to the Fair Fund website.

22. The Distribution Agent will establish and maintain a toll-free telephone number for Claimants to call to speak to a live representative of the Distribution Agent during its regular business hours, 8:00 a.m. to 8:00 p.m., Eastern Standard Time, or, outside of such hours, to hear prerecorded information about the Fair Fund. The Distribution Agent will advise the Commission staff of the toll-free telephone number. The Distribution Agent will also establish and maintain a traditional mailing address and an email address to enable Claimants to correspond with the Distribution Agent.

23. The Distribution Agent will attempt to locate any Potential Claimant whose mailing is returned by the United States Postal Service ("USPS") as "undeliverable." The Distribution Agent will utilize all means reasonably available, to obtain updated addresses in response to undeliverable notices, and forward any returned mail for which an updated address is provided or obtained. Additional efforts to identify new addresses for returned undelivered mail will be conducted as necessary and economically reasonable after consultation with the Commission staff.

### B. Claims Process

24. The Claims Filing Deadline will be clearly identified in all materials as the first business date following the calendar date 120 days from the Initial Mailing. To avoid being barred from asserting a claim, each Potential Claimant must submit to the Distribution Agent a properly completed Claim Form reflecting such Potential Claimant's claim, together with all required supporting documentation postmarked on or before the Claims Filing Deadline. A Claim Form that is postmarked after the Claims Filing Deadline will be marked as "late" and only accepted, if after consulting with the Commission staff, the processing of these claims will not delay the distribution process. Any extension of the Claims Filing Deadline will be published on the Fair Fund website. A Claim Form is to be deemed to be submitted when postmarked, if received with a postmark indicated on the envelope and if mailed by first-class mail and addressed in accordance with the instructions thereon. In all other cases, the Claim Form shall be deemed to have been submitted on the date when actually received by the Distribution Agent.

25. The Distribution Agent will, within 60 days of receipt, acknowledge via postcard the receipt of Claim Forms filed by Potential Claimants by mail. A claim is not deemed to be officially filed unless the Potential Claimant receives such a postcard (the "Acknowledgment Postcard"). In addition to acknowledging receipt, the postcard will contain the claim number for future reference. If an Acknowledgement Postcard is not received, the Potential Claimant can contact the Distribution Agent via the toll-free telephone number or email address stated in the Notice Packet.

26. Claim Forms must be properly filled out per the instructions provided by the Distribution Agent and must be accompanied by such documentary evidence as the Distribution Agent deems necessary or appropriate to substantiate the claim. Without limitation, this information may include third party documentary evidence of acquisitions of the Eligible Security during the Relevant Period, as well as holdings of the Eligible Security at pertinent dates.

27. When submitting claims to the Fair Fund on behalf of its clients, all Third-Party Filers must use the electronic filing template provided by the Distribution Agent in this matter. Files that do not comply with the template and format provided by the Distribution Agent may be rejected. Third-Party Filers must also submit a master proof of claim and release, as well as proof of authority to file on behalf of claimant(s) at the time the electronic file of transactions is submitted. Failure to do so may result in rejection of the claim(s).

28. Each Third-Party Filer must establish the validity and amount of each claim in its submission. Like all other claimants to the Fair Fund, Third-Party Filers must submit such supporting documentary evidence of purchases, dispositions, and holdings of the Eligible Security as the Distribution Agent deems necessary or appropriate to substantiate each individual claim. Without limitation, this includes the complete name of the claimant (beneficial account owner) and its TIN (for individuals) or EIN (for companies), sufficient contact information to confirm the identity of the beneficial owner, and documentation from the original bank, broker or other institution of purchases and dispositions of the Eligible Security (account statements, confirmations and other documentation of purchases and dispositions) during the Relevant Period on their trade dates, as well as holdings of the Eligible Security on pertinent dates. Documentation generated by the Third-Party Filer as well as affidavits in lieu of supporting documentation will not be accepted, unless for good cause the Distribution Agent determines it acceptable. The Distribution Agent will have the right to request, and the Third- Party Filer will have the burden of providing to the Distribution Agent, any additional information and/or documentation deemed necessary by the Distribution Agent to substantiate the claim(s) contained in the submission. Documentation from a Third-Party Filer that is not acceptable to the Distribution Agent will result in rejection of the affected claim(s). The determination of the Distribution Agent to reject a claim for insufficient documentation is final and within the discretion of the Distribution Agent and may not be appealed.

29. Distribution payments must be made by check or electronic payment payable to the beneficial account owner. The Third-Party Filer shall not be the payee of any distribution payment check or electronic payment. Any other payment arrangement must be discussed with the Distribution Agent and must be authorized by the Claimant (beneficial account owner). Compensation to the Third-Party Filer for its services may not be paid or deducted from the Distribution Payment.

30. Custodians, trustees, or professionals investing on behalf of more than one Potential Claimant in a pooled investment fund or entity will be required to complete a certification, which will require them, at a minimum, to attest that any distribution to the custodian, trustee, or investment professional representing multiple potentially eligible beneficial owners, will be

allocated for the benefit of current or former pooled investors and not for the benefit of management. The certification form will be available on the Fair Fund website and upon request from the Distribution Agent. All such custodians, trustees, or professionals investing on behalf of more than one Potential Claimant in a pooled investment fund or entity must have an auditable mechanism available to the Distribution Agent and the SEC staff to confirm that each Claimant, if determined an Eligible Claimant, received the Distribution Payment directed to them.

31. The Distribution Agent will review all claim submissions and determine the eligibility of each Potential Claimant to participate in the Fair Fund by reviewing the claim data and supporting documentation (or the lack thereof), verifying the claim, and determining each Potential Claimant's Eligible Share amount pursuant to the Plan of Allocation. Each Potential Claimant will have the burden of proof to establish the validity and amount of his, her or its claim, and that they qualify as an Eligible Claimant. The Distribution Agent will have the right to request, and the Potential Claimant will have the burden of providing to the Distribution Agent, any additional information and/or documentation deemed relevant by the Distribution Agent.

## C. <u>Claim Determination Processes</u>

32. The Distribution Agent will provide a Determination Notice to each Potential Claimant who filed a claim, and to each Class Action Claimant, setting forth the Distribution Agent's conclusions concerning such claim.

33. For those claims that are rejected in whole or in part, the Determination Notice will provide the reason(s) for the rejection (e.g., failure to provide required information or documentation, no Eligible Shares, etc.). The Determination Notice will also notify the Class Action Claimant or Potential Claimant of the opportunity to cure the rejection, if applicable, and provide instructions regarding what is required to do so. Any Claimant with a rejected claim will have twenty (20) days from the date of the Determination Notice to cure any rejections identified in the Determination Notice. Any Claimant seeking reconsideration of a rejected claim must advise the Distribution Agent in writing within twenty (20) days of the date of the notice. All requests for reconsideration must include a written request detailing the reason for the reconsideration on one page and the necessary documentation to substantiate the basis upon which the Claimant is requesting reconsideration of their claim.

34. For those claims that are in good standing, the Determination Notice will provide the number of Eligible Shares to the Claimant.

35. The Distribution Agent may consider requests for review of any claim determination presented by Claimants. Claimants who request review must provide a reason for the request and documents supporting their claim. The Distribution Agent will investigate the request for review, and within thirty (30) days of receipt of the written request, the Distribution Agent will notify the Claimant of the final resolution of the review. The Distribution Agent will notify the Commission staff of any request for review that does not result in the resolution

of the claim. The Distribution Agent will have the authority to waive technical claim deficiencies and approve claims on a case-by-case basis, or in groups of claims. All determinations made by the Distribution Agent in accordance with the Distribution Plan in any dispute, request for review, or request to cure a deficient claim will be final and not subject to dispute.

36. The Claimant has the burden of notifying the Distribution Agent of a change in his or her current address and other contact information, and of ensuring that such information is properly reflected in the Distribution Agent's records.

37. A recipient of an Eligible Security as a gift, inheritance, devise or by operation of law will be eligible to file a Claim Form and participate in the distribution of the Fair Fund to the extent the original purchaser would have been eligible under the terms of this Distribution Plan. Only one claim may be submitted with regard to the same transactions in the Eligible Security, and in cases where multiple claims are filed by the donor and donee, the donee claim will be honored, assuming it is supported by proper documentation.

38. Claims on behalf of a retirement plan covered by Section 3(3) of ERISA, 29 U.S.C. § 1002(3), which do not include individual retirement accounts, and such plan's participants, are properly made by the administrator, custodian or fiduciary of the plan and not by the plan's participants. The Distribution Agent will issue any payments on such claims directly to the administrator, custodian or fiduciary of the retirement plan. The custodian or fiduciary of the retirement plan will distribute any payments received in a manner consistent with its fiduciary duties and the governing account or plan provisions. With respect to any retirement plan that has been closed prior to the Distribution Agent's identification of Claimants, the Distribution Agent will endeavor to distribute funds directly to the beneficial accountholders of such retirement plans if the information required for such a distribution is known to or provided to the Distribution Agent.

## IV.    <u>Independent Third-Party Review</u>

39. After the Distribution Agent has completed the process of analyzing the claims and determining Eligible Share numbers in accordance with the Plan of Allocation, and prior to the distribution of any funds, the Distribution Agent will engage an independent, third-party firm, not unacceptable to Commission staff, to perform a set of agreed upon procedures, review a statistically significant sample of claims and ensure accurate and comprehensive application of the Distribution Plan. The Distribution Agent will communicate the results of the review to Commission staff together with any written analysis or reports related to the review, and, upon request, will make the firm available to the Commission staff to respond to questions concerning the review.

## V.    <u>Establishment of the Escrow Account</u>

40. Prior to disbursement of the Fair Fund, the Distribution Agent will establish accounts described as follows at a U.S. commercial bank ("Bank"), not unacceptable to Commission

staff. The Distribution Agent will establish an escrow account (the "Escrow Account") pursuant to an escrow agreement (the "Escrow Agreement") to be provided by Commission staff. The Escrow Account will be established to receive the monies from the Commission and the Fair Fund will be held in the Escrow Account until the time of distribution. The Distribution Agent will also establish a separate deposit account (e.g., controlled distribution account, managed distribution account, linked checking and investment account) (the "Distribution Account") for the purpose of funding the Distribution Payments to be distributed to Eligible Claimants. The accounts shall be in the name of and bearing the Employer Identification Number of the Fair Fund as custodian for the distributees of the Distribution Plan. The name of each account will be in the following form: "SEC v. AR Capital Distribution Fund, as custodian for the benefit of investors allocated a distribution pursuant to the AR Capital Distribution Plan."

41. During the term of the Escrow Agreement, if invested, the Escrow Account shall be invested and reinvested in short-term United States ("U.S.") Treasury securities backed by the full faith and credit of the U.S. Government or an agency thereof, of a type and term necessary to meet the cash liquidity requirements for payments to Eligible Claimants or tax obligations that may accrue. This may include investment or reinvestment in a bank account insured by the Federal Deposit Insurance Corporation ("FDIC") up to the guaranteed FDIC limit, or investments in AAA-rated Money Market Mutual Funds registered under the Investment Company Act of 1940 that directly invest 100% of their assets in short-term U.S. Treasury securities and obligations, all backed by the full faith and credit of the U.S. Government; provided, however, that the AAA-rated Money Market Mutual Funds' investments in short term U.S. Treasury securities will not be made through repurchase agreements or other derivative products.

42. In consultation with the staff of the Commission, the Distribution Agent will work with the Bank on an ongoing basis to determine an allocation of funds between the Escrow Account and Distribution Account that will preserve earnings, if possible, while providing maximum protection for the Fair Fund.

43. All interest earned will accrue for the benefit of the Fair Fund.

44. Upon receipt of the monies from the SEC into the Escrow Account, the Distribution Agent will provide a signed receipt to the Commission staff within ten (10) business days. The Commission staff will file the receipt with the Court.

45. Upon transfer from the SEC, the assets of the Fair Fund will be held in the Escrow Account, separate from Bank assets, until the presentation of checks. All Fair Fund checks presented for payment or electronic transfers will be subject to "positive pay" controls before they are honored by the Bank. The "positive pay" system provides protection against fraud arising from counterfeit or altered checks. The "positive pay" system will require, at a minimum, confirmation by the Bank that all checks presented for payment match the identifiers and amounts on the payee list prior to honoring such checks. In each instance, funds will be

transferred from the Escrow Account to the Distribution Account on the Bank's confirmation that a presented check matches the relevant "positive pay" criteria.

46. The Distribution Agent will provide copies of the bank and/or investment statements on any accounts established by the Distribution Agent to the Tax Administrator on a monthly basis and will assist the Tax Administrator in obtaining any other statements, as necessary.

## VI. **Distribution**

47. The Net Available Fair Fund will be distributed to Eligible Claimants with Eligible Shares as provided under the terms of this Distribution Plan. An Eligible Claimant's Eligible Share number, as determined in accordance with the Plan of Allocation contained in Appendix 1 to this Plan, will be used to determine their Distribution Payment.

48. The Distribution Agent will disburse the Net Available Fair Fund to all Eligible Claimants, in one or more tranches, once all Claim Forms have been processed and all Claimants whose claims have been rejected or disallowed, in whole or in part, have been notified and provided the opportunity to cure pursuant to the procedures set forth herein.

49. The Distribution Agent will prepare a list of all Eligible Claimants, the Eligible Share number, and the Distribution Payment of each Eligible Claimant ("Payment File"). The Distribution Agent will work with the Tax Administrator to prepare the relevant materials to effect a distribution, including determining an estimated distributable amount from the Fair Fund and establishing a prudent reserve to pay federal, state and local taxes and the fees and expenses of administration of the Tax Administrator and Distribution Agent payable in connection with the Fair Fund.

50. After receipt and acceptance of the Payment File, the Commission staff will petition the Court for authority to disburse the requested balance of the Net Available Fair Fund from the Commission to the Distribution Agent for distribution to Eligible Claimants pursuant to the Distribution Plan. In conjunction with any motion seeking approval of a distribution, the Payment File will, upon request, be made available to the Court under seal.

51. Following the Court's approval of the Commission's petition for the authority to distribute the Net Available Fair Fund to Eligible Claimants with Eligible Shares as provided for in this Distribution Plan, the Distribution Agent will commence the distribution as promptly as possible.

52. The Distribution Agent will distribute the Net Available Fair Fund to the Eligible Claimants based upon a *pro rata* distribution formula. As set forth in the Plan of Allocation in Appendix 1, this formula is the fraction of the Eligible Shares number of each Eligible Claimant divided by the aggregate Eligible Shares of all Eligible Claimants. No Distribution Payment will be made to an otherwise Eligible Claimant unless the amount to be paid equals or exceeds the *de minimis* amount of $10. After applying the *pro rata* distribution formula and eliminating the Eligible Claimants with a preliminary Distribution Payment of less than $10, KCC will

recalculate the distribution of the Net Available Fair Fund for the remaining Eligible Claimants pursuant to the *pro rata* distribution formula described above to determine each final Distribution Payment.

53. The Distribution Agent in its exclusive discretion may, but will have no obligation to, aggregate accounts held by a person in the same legal capacity in determining Eligible Share amounts and Distribution Payment amounts.

54. Checks will be issued by the Distribution Agent from the Distribution Account set up at the Bank. Checks will be issued in U.S. dollars and bear a stale date of ninety (90) days from the date of issuance. Accordingly, checks that are not negotiated within this Check-cashing Period will be voided, and the issuing financial institution will be instructed to stop payment on those checks, except as provided below. Where an Eligible Claimant's check is not negotiated within the Check-cashing Period and has been voided by the Distribution Agent, that Eligible Claimant's claim will be extinguished. All such funds will remain in the Fair Fund.

55. Payments to Eligible Claimants will be accompanied by a communication that includes, as appropriate:

   a. A statement characterizing the distribution;
   b. A statement that checks will be void and cannot be reissued after ninety (90) days from the date the original check was issued;
   c. A statement that reissued checks will expire on thirty (30) days from the date of the reissued check;
   d. A statement that the tax treatment of the distribution is the responsibility of each Eligible Claimant and that the Eligible Claimant should consult his or her tax advisor for advice regarding the tax treatment of the distribution; and
   e. Contact information for the Distribution Agent for questions regarding the Distribution Payment.

56. Distribution checks and/or accompanying communications will clearly indicate that the money is being distributed from a Fair Fund established to compensate investors for harm suffered as a result of their investment in ARCP. Any such communication, letter or other mailing to Eligible Claimants characterizing the distribution will be submitted to the Commission staff and the Tax Administrator for review and approval.

57. Wire transfers may be utilized at the discretion of the Distribution Agent to transfer approved Distribution Payments to filers. Wire transfers will be initiated by the Distribution Agent using a two-party check and balance system, whereby completion of a wire transfer will require an authorization by two members of the Distribution Agent's senior staff. Wire transfers will be executed in U.S. dollars, unless agreed to with the Commission staff.

58. Under no circumstances will the Distribution Agent, its employees or its agents incur any liability to any Person for making a distribution in accordance with the Order of the Court

approving the distribution and the schedules of Eligible Claimants, and all Persons shall be enjoined from taking any action in contravention of this provision. Upon receipt and acceptance by an Eligible Claimant of a distribution from the Fair Fund, such Eligible Claimant will be deemed to have released all claims that such Eligible Claimant may have against the Distribution Agent, its employees, agents, and attorneys in connection with the Distribution Plan and the administration of the Fair Fund, and shall be barred from prosecuting or asserting any such claims.

## VII. <u>Post Distribution</u>

### A. <u>Handling of Returned or Un-cashed Checks</u>

59. The Distribution Agent is authorized to reissue checks to Eligible Claimants who received a distribution upon the receipt of a valid, written request from the Eligible Claimant. Such reissued checks will be void thirty (30) days from the reissuance.

60. The Distribution Agent will research and attempt to locate all Eligible Claimants whose checks are returned to the Distribution Agent as undeliverable by the USPS. However, the Eligible Claimant has the burden of providing the Distribution Agent with any changes to his or her mailing address. The Distribution Agent will mail a reissued check to the updated address, subject to the time limits detailed herein.

61. In cases where an Eligible Claimant is unable to endorse a Distribution Payment (e.g., as the result of a name change because of marriage or divorce, or as the result of death), any request by an Eligible Claimant or a lawful representative for reissuance of a Distribution Payment in a different name must be documented to the satisfaction of the Distribution Agent. If such change is properly documented in the sole discretion of the Distribution Agent, the Distribution Agent will issue an appropriately redrawn Distribution Payment, subject to the time limits detailed herein.

62. The Distribution Agent will make reasonable efforts to contact Eligible Claimants who were mailed distribution checks to follow up on the status of un-cashed checks per thresholds agreed to with the Commission staff (other than those checks returned as "undeliverable") and will take appropriate action to follow up on the status of un-cashed checks at the request of Commission staff. The Distribution Agent may reissue such checks, subject to the time limits detailed herein.

**B. Disposition of Remaining Funds**

63. After the initial distribution is completed, if additional funds still remain, the Distribution Agent shall in consultation with Commission staff determine whether it is feasible to conduct another distribution to Eligible Claimants who negotiated their initial Distribution Payment, after setting aside a reasonable reserve for taxes, fees and expenses of administration for the Tax Administrator and Distribution Agent. Any additional distribution from the Fair Fund shall be conducted subject to the same procedure and limits described for the initial distribution, including the $10 *de minimis*, without further Court order.

64. If, after the distribution is complete, all tax obligations of the Fair Fund have been satisfied, and funds remain in the Fair Fund, the Commission staff, in consultation with the Distribution Agent, will make a recommendation to the Court as to the disposition of the remaining funds.

## VIII. The Distribution Agent

65. The Distribution Agent will be responsible for administering the Fair Fund in accordance with the Distribution Plan. This will include, among other things, taking reasonable steps to identify and contact Potential Claimants; obtaining accurate mailing information for Potential Claimants; establishing a website and staffing a call center to address inquiries during the claims process; developing a claims database; preparing accountings; cooperating with the Tax Administrator to satisfy any tax liabilities and to ensure compliance with income tax reporting requirements; advising Claimants of deficiencies in claims and providing an opportunity to cure any documentary defects; taking antifraud measures, such as identifying false, ineligible and overstated claims; making determinations under the criteria established herein as to Claimant eligibility; advising Claimants of final claim determinations; and disbursing the Fair Fund in accordance with this Distribution Plan.

66. To carry out the purposes of this Distribution Plan, the Distribution Agent is authorized to make and implement immaterial changes to the Distribution Plan upon agreement with Commission staff. If a change is deemed to be material by Commission staff, Court approval is required prior to implementation by amending the Distribution Plan.

67. The Distribution Agent may extend any procedural deadline contained in the Distribution Plan for good cause shown, if agreed upon by the Commission staff.

68. The Distribution Agent is authorized to enter into agreements with institutions ("Institutions") as may be appropriate or necessary in the administration of the Fair Fund, provided such Institutions are not excluded pursuant to other provisions of this Distribution Plan. In connection with such agreements, the Institutions shall be deemed to be agents of the Distribution Agent under this Distribution Plan.

69. The Distribution Agent will be entitled to reasonable administrative fees and expenses in connection with the administration and distribution of the Fair Fund (including any such fees

and expenses incurred by agents, consultants or third parties retained by the Distribution Agent in furtherance of its duties). The Distribution Agent will invoice all fees and expenses for the administration and distribution of the Fair Fund on a monthly basis directly to Commission staff.

70. In the interests of paying the administration fees timely, distributing funds expeditiously and conserving resources of both the Court and the SEC, the Commission staff is authorized to review, approve and pay all future fees and expenses of the Distribution Agent from the Distribution Fund, without further application or order from the Court. All such payments of fees and expenses shall be tracked and reported to the Court in a final accounting.

71. The Distribution Agent may be removed at any time by the Court, and replaced with a successor. In the event the Distribution Agent decides to resign, it will first give written notice to the staff of the Commission and the Court of such intention, and such resignation will not be effective until the Court has appointed a successor. The Distribution Agent will then follow such instructions as such successor or the Court provides in turning over management of the Fair Fund.

72. The Distribution Agent will retain all claims materials in paper and electronic form for a period of six (6) years after approval of the final report and final accounting and thereafter will transfer the documents to the Commission, pursuant to Commission staff direction. In addition, the Distribution Agent will shut down the website, P.O. Box and customer service telephone line(s) established specifically for the administration of the Fair Fund three (3) months after the closing of the Escrow and Distribution Accounts, or at such earlier time as the Distribution Agent determines with concurrence of the Commission staff.

## IX. Tax Compliance

73. The Fair Fund is a Qualified Settlement Fund ("QSF") under Section 468B(g) of the Internal Revenue Code, 26 U.S.C. § 468B(g), as amended. The Tax Administrator is the administrator of such QSF for purposes of Treas. Reg. § 1.468B-2(k)(3)(I), and shall satisfy the tax related administrative requirements imposed by Treas. Regs. § 1.468B-1 to § 1.468B-5, including, but not limited to:

   a. Obtaining a taxpayer identification number;

   b. Submitting requests for funds from the Fair Fund that are necessary for the timely payment of all applicable taxes, making timely payment of taxes for which the Tax Administrator has received funds, and filing all applicable returns; and

   c. Satisfying any information, reporting, or withholding requirements in connection with the distribution of the Fair Fund.

74. The Distribution Agent will work cooperatively with the Tax Administrator and timely provide requested information needed by the Tax Administrator to meet the information reporting and tax payment obligations of the Fair Fund.

75. All fees, costs and expenses of the Tax Administrator will be paid by the Fair Fund as part of the cost of the administration of the Fair Fund. Any taxes on interest earned by the Fair Fund will be paid by the Fair Fund.

## X. Fair Fund Reporting and Accounting

76. The Distribution Agent will provide to Commission staff, who will file with the Court, a quarterly status report within forty-five (45) days of Court approval of this Distribution Plan, and will provide additional reports and quarterly account statements within thirty (30) days after the end of every quarter thereafter as detailed below.

77 Once the money has been transferred to the Escrow Account, a quarterly account statement, in a format to be provided by the Commission staff, shall be submitted with the status report by the Distribution Agent.

78. The status report and quarterly account statement will inform the Court and the staff of the Commission of the activities and status of the Fair Fund during the relevant reporting period, and once funds are transferred to the Distribution Agent will specify, at a minimum:

    a. The location of the account(s) comprising the Fair Fund; and

    b. An interim accounting of all monies in the Fair Fund as of the most recent month-end, including the value of the account(s), all monies earned or received into the account(s), funds distributed to Eligible Claimants under this Distribution Plan, and any monies expended from the Fair Fund to satisfy any fees, costs, taxes and other expenses incurred in the implementation of this Distribution Plan.

79. The Distribution Agent will prepare a final report and final accounting, in a format to be provided by the Commission staff, when the Fair Fund administration is complete. In compiling the final accounting, the Distribution Agent will coordinate with the Tax Administrator. The Commission staff will file the final report and final accounting with the Court.

80. Commission staff, or other relevant party, shall provide the Distribution Agent with any and all account information relating to the Fair Fund that may be required to meet reporting obligations, including providing copies of any account statements that the Distribution Agent may request.

## XI. Termination of the Fair Fund

81. Once all Distribution Payments have been negotiated or voided, any funds remaining in the Escrow and Distribution Accounts will be transferred to the SEC.

82. The Fair Fund will be eligible for termination and the Distribution Agent will be eligible for discharge after all of the following have occurred:

    a. A final report and accounting has been submitted to and approved by the Court;

    b. All taxes have been paid; and

    c. All remaining funds have been disposed of as approved by the Court.

83. Once the Fair Fund has been terminated, no further reissue requests will be allowed and no additional payments will be made whatsoever.

## XII. <u>Limitation of Liability</u>

84. The Court may amend this Distribution Plan; and retains exclusive jurisdiction over all claims arising in connection with this Distribution Plan, including, but not limited to, claims against the Distribution Agent asserting liability for violation of any duty imposed by this Distribution Plan or other Court order.

85. The Distribution Agent is entitled to rely on all outstanding rules of law and Court orders. The Distribution Agent will not be liable to anyone, except the Commission on behalf of the Fair Fund for a pecuniary loss to the Fair Fund, for any action taken or omitted by the Distribution Agent in connection with the Distribution Plan and all Potential Claimants and Class Action Claimants will have no claims against the Distribution Agent, its employees, agents, and attorneys in connection with the Distribution Plan and the administration of the Fair Fund, and will be deemed enjoined from prosecuting or asserting any such claims, except upon a finding by this Court of gross negligence or reckless disregard of duty under this Distribution Plan.

86. The submission of the Claim Form and/or the receipt and acceptance of a Distribution Payment by an Eligible Claimant will not affect an Eligible Claimant's rights and claims as against any party (other than the Distribution Agent), including, without limitation, AR Capital, Schorsch, Block, and AR Capital's past or present directors, officers, employees, affiliates, nominees, creditors, advisors and agents.

## Appendix 1 – Fair Fund Plan of Allocation

This Plan of Allocation is designed to compensate Eligible Claimants based on their losses on shares of the ARCP common stock purchased or otherwise acquired at inflated prices at various points in time during the Relevant Period due to the misconduct of the Defendants, and held through the close of trading on October 28, 2014. Investors who did not purchase or otherwise acquire shares of the Eligible Security during the Relevant Period are ineligible to recover under this Plan.

*Eligible Shares* will be calculated as follows:

Shares of ARCP common stock purchased or otherwise acquired on or after February 28, 2013, including in the T3 merger, and such shares are held at close of trading on October 28, 2014.

FIFO Methodology: For each Claimant who made multiple acquisitions and sales of the Eligible Security during the Relevant Period, the transactions will be matched according to the first-in, first-out ("FIFO") method. The earliest sales during the Relevant Period will be matched first against any holdings at the opening of the Relevant Period (the "Beginning Holdings"). Once the Beginning Holdings have all been matched, or in the event that the Claimant had no Beginning Holdings, then any further sales would be matched against the earliest Relevant Period acquisitions and chronologically thereafter.

Transfers: The receipt or grant of the Eligible Security to the Claimant by gift, devise, inheritance, or operation of law during the Relevant Period is not considered an eligible acquisition if the original purchase or acquisition did not occur during the Relevant Period. Such shares will be excluded from the calculation of the Claimant's Eligible Shares.

*Pro Rata* Distribution Payment: Each Eligible Claimant's preliminary *Pro Rata* Distribution Payment will be determined by dividing the Eligible Claimant's total number of Eligible Shares by the total Eligible Shares of all Eligible Claimants and multiplying that fraction by the total amount of the Net Available Fair Fund identified for distribution. No Distribution Payment will be made to an otherwise Eligible Claimant unless the amount to be paid equals or exceeds the *de minimis* amount of $10. After applying the *pro rata* distribution formula and eliminating the Eligible Claimants with a preliminary Distribution Payment of less than $10, the Distribution Agent will recalculate the distribution of the Net Available Fair Fund for the remaining Eligible Claimants pursuant to the *pro rata* distribution formula described above to determine each final Distribution Payment.